THOMAS, Judge.
In March 2006, the Madison County Department of Human Resources (“DHR”) received information that De.H. and Da.H. were being subjected to domestic violence and drug use in the home of A.F. (“the mother”) and C.H. (“the father”). Pursuant to a safety plan, DHR placed the children with P.K. (“the paternal grandmother”) and began offering services to the mother and the father. The children were briefly reunited with the mother in August 2007, but they were again left with the paternal grandmother when the mother was incarcerated. The children were ultimately removed from the care of the paternal grandmother in February 2009, and DHR sought termination of the parents’ parental rights in a petition filed in October 2009. After a trial on February 5, 2010, the juvenile court entered a judgment terminating the parents’ parental rights to the children. The mother timely appeals.[1]
The record reflects the following facts. After the initial contact with the mother in March 2006, DHR provided the mother with a drug assessment, and, pursuant to the recommendation resulting from the drug assessment, routine drug screens. The mother tested positive for marijuana on her May 2006 drug screen; her June 2006 drug screen indicated that it might be diluted, and her October 2006 drug screen was positive for opiates and marijuana. The mother apparently fell out of contact with DHR for a short time, but she contacted DHR again in December 2006 and requested further assistance. DHR again required the mother to undergo drug screens, and the mother tested positive for opiates in June 2007 and positive for opiates and benzodiazepine in July and August 2007. The mother was arrested in July 2007. However, despite the positive drug screens and the mother’s arrest, DHR returned the children to the mother’s custody briefly in July or August 2007.
The mother had married at some point in 2007 and had stable housing with her husband, D.F. The mother’s stability was short-lived, however, because her husband died in August 2007 after being diagnosed with leukemia. The mother was incarcerated at some point after D.F.’s death, but she was released in November 2007, when she gave birth to D.F., Jr.[2] Because the mother had arranged for the children to be placed in the custody of the paternal grandmother during her incarceration, DHR did not seek custody of the children at that time.
In November 2007, DHR again began to offer the mother services. The mother underwent another drug assessment, after which she was referred to New Horizons for outpatient drug treatment. Although the mother began attending the New Horizons program, she was terminated from the program for excessive absences in June 2008. The mother’s December 2007 drug screen was negative for all substances; however, her January 2008 drug screen indicated that it was diluted, her May 2008 drug screen was positive for opiates, benzodiazepine, and marijuana, and her July 2008 drug screen was positive for opiates and benzodiazepine.
In July 2008, the mother underwent a psychological evaluation by Lois W. Petrel-la. Petrella diagnosed the mother with adjustment disorder with mixed anxiety *208 and depressed mood, dependent personality disorder, and borderline intellectual functioning. According to Petrella, the mother’s prognosis was “guarded due to personality disorder, history of substance abuse, and lack of insight into her problems.” Petrella opined that the mother’s mental state needed improvement before the children could be returned to her care and recommended psychological counseling to address adjustment, emotional dependence, and bereavement issues and a psychiatric evaluation to assess whether the mother might need antidepressant medication. Petrella also recommended that the mother be encouraged to complete a GED diploma, that she take parenting classes, and that she continue to be subject to random drug screens if the children were returned to her custody. The mother was not provided counseling or a psychiatric evaluation; however, DHR attempted to arrange parenting classes for the mother in July 2008, but the mother’s telephone had been disconnected and she could not be contacted.
The record contains no evidence regarding the mother’s whereabouts or whether she was offered any services between August 2008 and March 2009. The record of the mother’s drug screens indicates that she took no drug screens between July 2008 and March 2009. Although the record is not entirely clear on this point, it appears that the children continued to reside with the paternal grandmother until February 2009, when the paternal grandmother indicated that she could no longer care for the children because of her husband’s failing health. The record also indicates, although not clearly, that the mother was arrested three more times after her July 2007 arrest — in July 2009, in August or September 2009, and in October 2009.
Jamonica England, the family’s caseworker, testified that she sought and considered other relatives for custody after the paternal grandmother relinquished custody of the children. A maternal cousin of the children, T.J., was considered for placement; however, during the home-study process, T.J. lost her job, was relocating from Michigan to Florida, and requested that she be given time to settle before being considered further. England testified that she had considered a paternal uncle of the children, A.W., and his wife, B.T.; however, England said, A.W. tested positive for marijuana. According to England, two other relatives, J.S. and L.P., declined to be considered, and the mother’s sister, A.S., was not an appropriate placement because of DHR’s involvement with her family.
England testified that R.W. and S.W., the father’s half brother and his wife, had contacted DHR in September 2009, seeking to be potential resources for the children. England testified that she had requested a home study on R.W. and S.W. She also testified that both had taken a drug screen in September 2009 and that, although S.W. had had a negative screen, R.W.’s screen had indicated that it was diluted.
The home-study process was initiated by Amina Lattimore, a DHR caseworker in the home-study unit. Lattimore testified that she has begun the home-study process on R.W. and S.W. on October 20, 2009, with her initial contact with them occurring on December 14, 2009. Latti-more said that she visited the home of R.W. and S.W. on December 18, 2009, and that, at that time, she and the family completed necessary paperwork. R.W. and S.W. were required to take fingerprint cards to a local law-enforcement agency so that they could be fingerprinted for a background check. Although R.W. and *209 S.W. did as instructed, the fingerprint technician failed to sign the necessary paperwork, necessitating a return of the fingerprint cards to R.W. and S.W. The background-check process was delayed by this problem, and, ultimately, Lattimore was unable to send the necessary paperwork to institute the background-check process until January 26, 2010. The background check had not been completed at the time of the termination trial on February 5, 2010.
Lattimore also had R.W. and S.W. submit to drug screens as a part of the home-study process. S.W.’s drug screen was negative for all substances. R.W.’s first drug screen, taken on January 26, 2010, came back indicating that it was diluted. Lattimore noted in her preliminary home-study report that the technician had indicated that the result could be “a fluke.” Lattimore requested that R.W. take a second drug screen, which he did on February 1, 2010. R.W.’s second drug screen was negative for all substances. The trial court ordered that R.W. and S.W. take a drug screen on the day of trial; both screens were negative for all substances.
In her preliminary report, Lattimore noted that R.W. and S.W. were “appropriate resources” for the children and that she had no concern regarding the safety or well being of the children were they to be placed with R.W. and S.W. However, Lat-timore testified that she could not give a definitive recommendation on the home study until the background checks were returned. Lattimore’s preliminary report noted that R.W. and S.W. had three children of their own and that they had a mentally challenged adult relative living in their home. In addition, the report stated that R.W. and S.W. had provided care for a nephew under a safety plan administered by the Morgan County Department of Human Resources. Lattimore said that the indication that two drug screens might have been diluted caused her concern; she said that she would like to have R.W. undergo additional drug screens to rule out any possible drug use.
Panda Smith, who counseled the children from August 18, 2009, until the time of trial, testified that she was employed to counsel the children to address their defiant behaviors, their sibling interaction, and their exposure to drug use and domestic violence. Smith testified that the children had made progress in counseling and in their foster home. According to Smith, the children needed a lot of “hands-on parenting” with nurturing, discipline, boundaries, consequences, and rewards. She noted that both children needed significant attention and assistance with school work. She noted specifically that De.H. had a difficult time with transition, competition, bossiness, and sibling rivalry.
Smith had recommended in August 2009 that the children no longer have visitation with their parents because such exposure could cause regression. She noted that the children had come from an unstable home and that they had developed an attachment to their foster parents and to her, as their counselor. Smith opined that placement with R.W. and S.W. would not be in the best interest of the children because the children had no real bond with R.W. and S.W. and because the children were attached to the foster parents. Smith also stated that the placement of the children into a home with other children and a mentally challenged adult was not ideal for the children because of their need for significant attention and hands-on parenting.
R.W. and S.W. testified at trial regarding their desire to be placement resources for the children. R.W. testified that he was regularly employed and that he earned between $1,600 and $1,700 per *210 month. R.W. also testified that he was subject to random drug screens in connection with his employment and that he had not tested positive on any workplace drug screen. S.W. explained that she and R.W. had three children, aged 16, 13, and 9, and that a mentally challenged adult relative, J.J., lived with the family. R.W. explained that he and S.W. took J.J. in after J.J.’s father died and he had no one else to look after him. S.W. testified that J.J. was not a threat to her children. S.W. admitted that she and R.W. had not seen the children often before their placement into foster care, noting that most of the time they had seen the children on holidays during family gatherings. Both R.W. and S.W. testified that they could provide for the children and that they desired to take the children into their home and provide a permanent home for them.
The mother testified that she was currently incarcerated awaiting sentencing for four felonies and one misdemeanor to which she had pleaded guilty on the same day as the termination trial. The mother admitted that she had a substance-abuse problem and that she had not been able to provide a safe and stable home for her children. She testified that she had given the paternal grandmother money at times to assist with the children’s expenses; however, she admitted that she had not paid child support to DHR or to the foster parents.
The mother further testified that she had been sexually abused at age 8 by her mother’s stepbrother and that a man named “M” had attempted to sexually abuse her at age 11. According to the mother, she deliberately got pregnant at age 13 or 14 in order to get out of her mother’s house; the mother reported that her own mother had done drugs and that there were different men in and out of the house. After she left home at age 13, the mother moved in with the father, who was at that time 18 years old, and the paternal grandmother. The mother gave birth to De.H. when she was 14 and to Da.H. when she was 15. She and the father had never married, but they had lived together both as a couple and as roommates. In fact, the mother and her boyfriend and the father and his girlfriend were living in the same home when it was raided by the police in August 2009.
The mother admitted that she was terminated from the New Horizons drug-treatment program for excessive absences. She said that she had applied to and had been accepted into an inpatient drug program known as The Foundry. However, the mother admitted that she was not sure that she would be able to attend the program at The Foundry; apparently, she had requested that she be allowed to do so as a condition of her sentencing on the felony convictions, and she was awaiting the approval of the judge on her criminal cases. According to the mother, she wanted R.W. and S.W. to have custody of the children so that she could “have a chance” with her children. She said that she loves and wants her children despite her past actions having been not in their best interests.
At the close of the testimony, the juvenile court announced in open court that it would terminate the mother’s rights. During its instructions regarding the written order to be prepared by DHR’s attorney, the juvenile court remarked:
“I am, however, going to take under advisement the permanency requested by [DHR] at this point in time. I’m not going to make a permanency determination. I have read the case law and I believe that I can terminate parental rights even with a relative resource and place children with a relative after ter *211 mination. This Court is at least considering that. I want everybody to understand that.”
As noted above, the mother appeals the judgment terminating her parental rights.
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004). A juvenile court’s judgment terminating parental rights must be supported by clear and convincing evidence. Bowman v. State Dep’t of Human Res., 534 So.2d 304, 305 (Ala.Civ.App.1988). “Clear and convincing evidence” is “ ‘[e]vi-dence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ” L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala.Code 1975, § 6-11-20(b)(4)). The juvenile court’s factual findings in a judgment terminating parental rights based on evidence presented ore tenus are presumed correct. D.P. v. Madison County Dep’t of Human Res., 23 So.3d 1156, 1158 (Ala.Civ.App.2009).
The termination of parental rights is governed by Ala.Code 1975, § 12-15-319. That statute reads, in part:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
“(1) That the parents have abandoned the child, provided that in these cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
“(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for needs of the child.
“(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by the treatment of a sibling.
“(4) Conviction of and imprisonment for a felony.
“(5) Commission by the parents of any of the following:
“a. Murder or manslaughter of another child of that parent.
“b. Aiding, abetting, attempting, conspiring, or soliciting to commit murder or manslaughter of another child of that parent.
“c. A felony assault or abuse which results in serious bodily injury to the surviving child or another *212 child of that parent. The term serious bodily injury shall mean bodily injury which involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.
“(6) Unexplained serious physical injury to the child under those circumstances as would indicate that the injuries resulted from the intentional conduct or willful neglect of the parent.
“(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
“(8) That parental rights to a sibling of the child have been involuntarily terminated.
“(9) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of support of the child, where the parent is able to do so.
“(10) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the Department of Human Resources, or any public or licensed private child care agency, and agreed to by the parent.
“(11) Failure by the parents to maintain consistent contact or communication with the child.
“(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
On appeal, the mother argues that the juvenile court’s judgment terminating her parental rights is not supported by clear and convincing evidence. She specifically argues that the juvenile court’s finding that DHR made reasonable efforts to rehabilitate her is not supported by the evidence because, she contends, DHR offered her no services other than drug assessments, drug screens, and outpatient drug treatment despite the recommendation of the psychologist that the mother be given counseling to address bereavement and other issues and that she be evaluated regarding a possible need for antidepressant medication. The mother also challenges the juvenile court’s finding that she had not substantially provided for her children. Secondly, the mother argues that the juvenile court erroneously applied the law to the facts to determine that no viable alternative to termination of her parental rights existed because, she says, R.W. and S.W. were appropriate and viable relative resources that should have been considered by the juvenile court. The mother further argues throughout her brief that DHR violated her procedural-due-process rights.
DHR argues that it did attempt to rehabilitate the mother by providing her with drug assessments and drug treatment but that the mother continued her abuse of drugs, as evidenced by repeated positive drug screens throughout the entire four-year period that DHR worked with the mother. DHR further explains that it could not offer rehabilitative services to the mother once she was incarcerated in September 2009. Regarding the mother’s argument that R.W. and S.W. are a viable alternative to the termination of her parental rights, DHR argues that the juvenile court, as the fact-finder in a termination-of-parental-rights case, could have weighed the evidence and determined that *213 R.W. and S.W. were not a viable alternative because of RW.’s diluted drug screens, the lack of a relationship between R.W. and S.W. and the children, and evidence that placement with R.W. and S.W. would not be in the best interest of the children. Finally, DHR argues that the mother failed to raise any issue regarding procedural due process in the juvenile court and that she is thus precluded from relying on that argument on appeal.
The mother does not specifically challenge the establishment of grounds to terminate her parental rights. The mother admitted that she had a substance-abuse problem. See § 12-15-S19(a)(2) (listing as one factor to be considered by the juvenile court “excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for needs of the child”). She readily admitted that she could not provide a stable home for her children at the time of the termination hearing. She admitted that she had not provided support for the children. Although she is correct that poverty alone is not a proper basis for the termination of parental rights, see C.B. v. State Dep’t of Human Res., 782 So.2d 781, 784 (Ala.Civ.App.1998), and In re Hickman, 489 So.2d 601, 602-03 (Ala.Civ.App.1986), the record is replete with evidence indicating that the mother continued to abuse drugs throughout the four-year period of DHR’s involvement with her family, that she had been arrested at least four times, that she was facing sentencing on four felony convictions at the time of the termination trial, and that she had not taken responsibility for her children since they were first removed from her care in March 2006, other than for a brief period in July or August 2007.
The mother does argue that the record does not contain clear and convincing evidence that DHR used reasonable efforts to rehabilitate her and to reunify her with her children. She takes issue with the fact that DHR failed to provide her with counseling and a psychiatric evaluation recommended by Petrella in August 2008. However, the record reflects that when England attempted to contact the mother in July 2008 to arrange parenting classes, which were also recommended by Petrella, the mother’s telephone was disconnected and England could not contact the mother. The record further reflects that the mother took no drug screens between August 2008 and March 2009. England testified that the mother disappeared at times and that she was sometimes incarcerated; England did not specify the dates that the mother disappeared or that she was incarcerated, but the record appears to support a conclusion that the mother’s whereabouts were unknown to DHR between August 2008, when England was first unable to contact the mother, and March 2009, when the mother took another drug screen. DHR could not provide additional services to the mother when the mother’s whereabouts were unknown to DHR or when the mother was incarcerated.
DHR did provide the mother with two drug assessments, drug screens, and an outpatient drug-treatment program, from which the mother was terminated for excessive absences. The mother focuses on the fact that she was not terminated from the drug-treatment program for failing drug screens. However, the mother was required to meet attendance standards in order to complete the program, and her failure to do so, for any reason, is a basis for concluding that the mother is either unable or unwilling to make the necessary changes to her life to become a proper parent for the children. We conclude, therefore, that DHR made reasonable efforts to rehabilitate the mother, that the mother did not avail herself of the offered resources, and that the mother’s lack of *214 effort to adjust her circumstances support the juvenile court’s conclusion that DHR established, by clear and convincing evidence, grounds to terminate the mother’s parental rights.
The mother next argues that the juvenile court should not have terminated her parental rights in light of the availability of R.W. and S.W. as a potential relative placement alternative. The juvenile court’s comments at the close of the termination trial indicated that it intended to consider placement with or an award of custody to R.W. and S.W. as a possible permanency plan for the children at a later hearing on the matter. Such a statement, in conjunction with the evidence regarding R.W. and S.W. in the record, says the mother, conflicts with a determination that no viable alternative to the termination of her parental rights exist.
The mother’s argument is based on the premise that, if any viable placement alternative exists, a juvenile court may not terminate parental rights. We have recently rejected that premise in a case involving a termination of parental rights under former Ala.Code 1975, § 26-18-7. A.E.T. v. Limestone County Dep’t of Human Res., 49 So.3d 1212, 1216 (Ala.Civ.App.2010). In A.E.T., we adopted the rationale expressed by then Judge Murdock in the main opinion in D.M.P. v. State Department of Human Resources, 871 So.2d 77, 94 (Ala.Civ.App.2003) (plurality opinion), that “the existence of a viable alternative was not an absolute bar to termination of parental rights in cases in which the parent was shown to be ‘irremediably unfit.’” A.E.T., 49 So.3d at 1217. We explained that “the existence of [a relative] as a potentially viable placement alternative would not, in and of itself, prevent the juvenile court from terminating [a parent’s] parental rights, if reunification of the [parent] and the child were no longer a foreseeable alternative.” Id. at 1217.
Relying on the explanation of the purpose of a viable alternative by then Judge Murdock in D.M.P., we held that a viable placement alternative is to be considered under circumstances where continued efforts are to be made to rehabilitate the parent and to reunite the family. Id. at 82. However, we further held that the duty to consider those alternatives cannot bar termination of parental rights once it is determined that rehabilitation of the parent and reunification of the family is not likely in the foreseeable future. Id. at 94. We quoted from then Judge Mur-dock’s explanation in D.M.P.:
“ ‘[W]here it is demonstrated that the parents are not capable of being rehabilitated or that the “conduct or condition” of the parents that makes them unfit to retain custody of their children “is unlikely to change in the foreseeable future” or where ... reunification is otherwise not an appropriate goal, obviously no alternative can be considered viable to the end of returning the child to a normal custodial relationship with his or her parent. The State’s failure, therefore, to pursue some alternative to termination that might exist in such a case would not necessarily be fatal to its petition for termination of a parent’s rights.’ ”
A.E.T., 49 So.3d at 1218 (quoting D.M.P., 871 So.2d at 92-93 (footnotes omitted)).
The situation presented in A.E.T., where the father was serving a 99-year prison sentence, was more extreme than the situation here, where the mother has failed to adjust her circumstances and resolve her substance-abuse problem over a four-year period. However, the juvenile courts in both cases had before them sufficient evidence to determine that the parent in question was “unable or unwilling to dis *215 charge [his or her] responsibilities to and for the child [or children in question],” that the “condition of the parent[] renders them unable to properly care for the child [or children in question],” and that “the conduct or condition [of the parent] [was] unlikely to change in the foreseeable future” such that termination of that parent’s rights was warranted. See § 12-15-319(a). Once the juvenile court in the present case reached that conclusion, it was no longer required to consider whether a viable placement alternative existed before terminating the mother’s parental rights. A.E.T., 49 So.3d at 1217.
Finally, we reject the mother’s arguments regarding any denial of due process based on DHR’s carrying out its duty to rehabilitate the mother and reunify the family. As we have explained in our discussion regarding whether clear and convincing evidence supported the juvenile court’s conclusion that termination of the mother’s parental rights was warranted, DHR made attempts to rehabilitate the mother that were unavailing because of the mother’s inability to overcome her substance-abuse problems or the mother’s instability, incarceration, and failure to keep in contact with DHR. More importantly, however, the mother never advanced any due-process arguments in the juvenile court, and we may not consider arguments made for the first time on appeal. Ex parte Dixon, 841 So.2d 1273, 1278 (Ala.Civ.App.2002) (declining to consider due-process arguments raised for the first time on appeal).
Because the evidence presented at trial clearly and convincingly established grounds for termination, because the existence of R.W. and S.W. as a potential placement alternative is not a stumbling block to termination where the evidence establishes that reunification of the family is unlikely in the foreseeable future, and because the mother’s due-process arguments were not preserved for appeal, we affirm the termination of the mother’s parental rights.
AFFIRMED.
PITTMAN and BRYAN, JJ„ concur.
THOMPSON, P.J., and MOORE, J., concur in the result, without writings.

. The father does not appeal.

. The mother's parental rights to D.F., Jr., are not at issue in this appeal.