## ADOPTION OF PEGGY.

Worcester. March 7, 2002. - May 3, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Juvenile Court,* Jurisdiction. *Jurisdiction,* Juvenile Court. *Adoption,* Dispensing with parent's consent. *Parent and Child,* Dispensing with parent's consent to adoption, Adoption, Custody. *Minor,* Adoption, Custody.

A Juvenile Court judge had authority under G. L. c. 119, § 24, to terminate the parental rights of a foreign natural living in the United States on a nonimmigrant visa, where the Juvenile Court's jurisdiction over the matter stemmed from the presence of the foreign national's child in the Commonwealth and the child's obvious need of care and protection, and where neither Federal immigration law or international law was violated. [696-700]

In a proceeding to dispense with parental consent to adoption, the judge's determination that a father was currently unfit to further the welfare and best interests of his child was supported by clear and convincing evidence; certain medical reports and statements were properly admitted; and the judge was warranted in concluding that the best interests of the child would be served by issuing a decree to dispense with the need for the father's consent to adoption and by accepting the proposed plan for the child's adoption submitted by the Department of Social Services. [700-705]

PETITION filed in the Worcester Division of the Juvenile Court Department on April 9, 1999.

The case was heard by *Jan L. Najemy,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Lisa Sheehan* for the father.

*Ann Balmelli-O'Connor* for Department of Social Services.

*Warren Yanoff (Amy E. Valletta* with him) for the child.

GREANEY, J. A judge in the Worcester Division of the Juvenile Court Department adjudicated the five year old daughter, whom we shall call Peggy, of S.T. (father), an Indian national living in the Commonwealth on a temporary work visa, in need of care and protection and committed her to the permanent custody of

the Department of Social Services (department), pursuant to
G. L. c. 119, § 26. The judge also ordered the entry of a decree,
pursuant to G. L. c. 210, § 3, dispensing with the need for the
father's consent to, or notice of, any petition for the adoption of
the child. The father appealed, contending that (1) the judge
lacked authority to terminate the parental rights of a foreign
national living in the United States on a nonimmigrant visa; (2)
the judge's determination that he was an unfit parent for his
daughter was based on erroneous findings of fact or improperly
admitted evidence; and (3) the judge failed to comply with
mandates contained in G. L. c. 210, § 3, in determining that the
best interests of the child would be served by issuing a decree
to dispense with the need for the father's consent to adoption.
We transferred the appeal to this court on our own motion
primarily to consider whether the Juvenile Court Department
has subject matter jurisdiction over an action to terminate the
parental rights of a nonimmigrant alien father to his nonimmi-
grant alien child. We conclude that the Juvenile Court properly
exercised jurisdiction and now affirm the decree.

We first summarize the relevant procedural history. On April
9, 1999, the department filed a care and protection petition
pursuant to G. L. c. 119, § 24, in the Juvenile Court on behalf
of Peggy, then three and one-half years old, who had been
admitted to the University of Massachusetts Medical Center on
the previous day with numerous injuries. Counsel was appointed
for the child and for the father.[1] The department was granted
temporary custody of the child. On April 12, 1999, a temporary
custody hearing was held pursuant to G. L. c. 119, § 24, at
which the department's custody of the child was continued. At
that time, a court investigator was appointed, as well as a guard-
ian ad litem for the child to determine what, if any, immediate
medical treatment was in her best interest and to consent to
such treatment. On January 25, 2000, the department filed a
notice of intent to terminate parental rights pursuant to G. L.
c. 210, § 3. A permanency hearing was subsequently held,
pursuant to G. L. c. 119, § 29B, at which it was determined that
adoption of the child was the goal of the department.

---

[1] Counsel was also appointed to represent the father's wife, M.H., who at
the time was believed to be the child's mother. Her appointed counsel
withdrew after it was learned that she was, in fact, the child's stepmother.

A trial on the department's care and protection petition was then conducted over the course of fourteen days. The judge entered a decision containing detailed findings of fact and conclusions of law. The judge found that the father was unfit to assume parental responsibility for his daughter, that his unfitness was likely to continue into the indefinite future, and that it was in the best interests of the child to terminate the father's parental rights. The judge also determined that an adoption plan proposed by the department served the child's best interests.[2] A decree was issued dispensing with the need for the father's consent to, or notice of, any petition for the child's adoption.[3]

We summarize the findings of fact made by the judge. Peggy was born on October 27, 1995, to the father and his wife, A.T., in Proddatur, India. A.T. died on April 7, 1997, in a fall from the third-floor balcony of the family's residence in Hyderabad, India. Until her death, A.T. was the child's primary caretaker. After her mother's death, the child was placed in the care of her paternal grandmother. On September 12, 1997, the father married M.H. On April 23, 1998, the father immigrated to the United States on a temporary visa to work as a computer software specialist in Northborough. Shortly thereafter, he moved to Colorado, where he was engaged as a consultant for one of his employer's clients. On October 17, 1998, M.H. and the child joined him in Colorado, leaving the couple's newborn son with relatives in India. While living in Colorado, only the father and M.H. took care of the child.

On or about November 24, 1998, the child fractured her elbow. On November 26, the father and M.H. brought her to the emergency room of a hospital in Colorado Springs, but denied witnessing how the child had been injured. The examining physician advised the couple that the child needed immediate

[2]The department proposed the adoption of the child by her current foster parents, referred to in this opinion as Mr. and Mrs. C.

[3]We attach no importance to the fact that the decree dispensing with the need for the father's consent to the child's adoption, pursuant to G. L. c. 210, § 3, was dated November 30, 2000, while the judge's findings and conclusion of law supporting the termination of the father's parental rights, pursuant to G. L. c. 119, § 26, was dated December 6, 2000. Judges, in cases like this, will often order the entry of a decree when they are certain of the result, and will follow up thereafter with the required findings of fact and conclusions of law. The practice expedites the process in cases that are time sensitive.

corrective surgery. Although their initial reaction was to inform the doctor that they preferred to defer such surgery until they could return to their home in India, after further discussion, they agreed to allow immediate surgery to repair the child's elbow. The operation required orthopedic follow-up, without which, the couple were informed, the child could have problems with her growth. Because the family planned to move back to the Boston area in December, they were referred to two orthopedic doctors whom they could consult in that area, but the child never received follow-up orthopedic care.

The family left Colorado on December 23, 1998, driving cross-country to Massachusetts, and arrived on December 27, 1998. After staying in a company guest house on the property of the father's employer for fifteen days, the family moved into an apartment in Framingham. From the time of her arrival in Massachusetts until April 8, 1999, the child was in the exclusive care at all times of the father and M.H. No babysitter or day care provider ever took care of her. M.H. and the child stayed home all day while the father was away at work, and they did not have visitors.

On April 6, 1999, M.H. informed the father that the child had a soft spot on the back of her head that she had discovered while brushing the child's hair. Her husband told her to make an appointment to see the pediatrician the next day. At approximately 2:30 A.M. on April 7, the child reportedly woke the father because she needed to use the bathroom. According to the father, the child's right eye, which had appeared fine when she went to bed, was swollen shut. Although the father, M.H., and the child shared one sleeping space, with the father in the middle, he had no explanation for the injury to the child's eye.

In the afternoon of April 7, 1999, the father brought the child to the doctor. The doctor discovered that, in addition to the swollen eye and swelling in the back of her head, the child had bruises on her body. An infected abrasion to her left ear and abrasions on her middle finger, which the father stated had been evident since March, were also present. The doctor did not observe any abnormality in her genital area nor did the father or M.H. call his attention to that area. The doctor instructed the father and M.H. to take the child immediately to the University of Massachusetts Medical Center (UMMC).

On being admitted to UMMC the next day, the child was observed to have numerous injuries. Her principal injury consisted of the amputation of seventy-five per cent of her labia minora and the displacement of the clitoral hood from its superior position to lower down on the external genitalia. The injuries were consistent with the practice known as "female circumcision."[4] According to the pediatric surgeon at UMMC who examined the child, these injuries could not have been self-inflicted by a three and one-half year old child, and could only have been caused by a "cutting or cauterizing device." The judge found that the damage to the child's genitalia was consistent with a deliberate cutting of the clitoris, clitoral hood and labia.

The child was also observed to have an abnormally low hematocrit level, caused by the loss of blood attendant to the amputation of her genitalia. She also had severe anemia consistent with the loss of blood. The "boggy swelling" on the back of the child's head was determined to be a subdural hematoma, typically caused by a blow or trauma to the head. In addition, the child was also observed to have (a) a swollen right eye; (b) a swollen left eye; (c) a one centimeter long injury to her left upper lip; (d) multiple injuries to the fingers of both hands; (e) a "chronic injury" to her left ear comparable to a "cauliflower ear"; and (f) bruising on her back and shoulder.

The judge did not credit statements made by the father and M.H. that all the child's injuries were self-inflicted, nor did the judge credit the father's explanation that the damage to his daughter's genitalia resulted from her scratching herself. The UMMC staff observed no self-abusive behavior of any nature during the child's stay at the hospital. The judge found that the injuries to the child's genitalia were undoubtedly inflicted on her. In view of the fact that the child was in the exclusive custody of the father or M.H. at all times relevant to her injuries, the judge found that the father either participated in his daughter's mutilation or knowingly failed to take any steps to protect her from her abuser.

---

[4] The judge made a specific finding that "female circumcision" is not part of the rituals or beliefs of the Hindu religion, the religion practiced by the family. This finding is not challenged.

After receiving temporary custody, the department made reasonable efforts to locate an appropriate foster home for the child. Although the department attempted to develop a service plan for the child's family, neither the father nor his wife would cooperate with the department, on advice of counsel, due to a pending criminal proceeding stemming from the child's injuries. After a diligent search, the department failed to locate within the Commonwealth a foster family that spoke the child's native language, Telugu, or one which practiced the Hindu religion. At the time of the child's discharge from UMMC on April 20, 1999, there were no relatives with whom she could be placed within the Commonwealth. The child was originally placed in an approved foster home in which the foster father was a practicing physician, but shortly thereafter, due to her need for extraordinary care, she was placed in the care of a more experienced foster family, Mr. and Mrs. C., with a diverse, multicultural background.

In August, 1999, the child's paternal grandmother traveled to Massachusetts from her home in India. She resided with her son, the father, throughout her stay in the Commonwealth. On being informed of her interest in gaining custody of the child,[5] arrangements were made for the services of an interpreter so that the department could assess her suitability as a placement for the child. This assessment never took place, due to a no-contact order that prohibited any contact between the child and the grandmother.[6] The grandmother subsequently returned to India without having seen the child. At the time of trial, the child had not seen her grandmother in nearly two years.

---

[5]In January, 2000, the grandmother filed a motion to intervene in the custody proceedings. The motion was denied and the grandmother did not appeal. She also filed a petition in the Juvenile Court to obtain guardianship of the child and, in May, 2000, requested that the department consider her as a placement for her granddaughter. It is not apparent what action, if any, was taken with regard to her guardianship petition. The department refused her request to have the child placed in her care.

[6]The no-contact order was issued in the pending criminal suit against the father and M.H. based on their suspected abuse of the child. The judge found that the department had been informed that the no-contact order had been issued by the Superior Court. The record indicates, however, that the order may have been entered in the Framingham Division of the District Court Department.

By the time of trial, the child had become an integral part of her new foster family and had formed strong attachments to her foster parents, Mr. and Mrs. C., and to their other children. Under the care of Mr. and Mrs. C., the child's symptoms of post-traumatic stress disorder, exhibited as a result of her recent trauma, almost entirely abated. The judge concluded that the severance of the child's new primary attachment to Mrs. C. posed an unacceptable risk that the child would develop an attachment disorder. The judge thus approved the department's proposal for the adoption of the child by Mr. and Mrs. C.

We turn now to issues raised by this appeal.

1. The father claims that the judge lacked authority to dispense with his consent to the child's adoption because both he and the child are Indian nationals. This claim was not raised below. We consider it nonetheless, because it is framed, at least in part, as a challenge to the court's subject matter jurisdiction. Issues of subject matter jurisdiction are nonwaivable and may be raised at any time. See *Central Transp., Inc.* v. *Package Printing Co.*, 429 Mass. 189, 189 (1999).

General Laws c. 119, § 24,[7] grants broad authority to the Juvenile Court to act on the petition of any person brought on behalf of any child under the age of eighteen years "within the jurisdiction of the court." This authority includes committing the child to the permanent custody of the department, if the court adjudges that the child "is in need of care and protection" as defined by the statute. See G. L. c. 119, § 26. See also *Custody of a Minor (No. 1)*, 385 Mass. 697, 704 (1982). If the child so adjudged is under the age of twelve years, the Juvenile

[7] General Laws c. 119, § 24, provides, in relevant part: "The divisions of the juvenile court department, upon the petition under oath of a person alleging on behalf of a child under the age of [eighteen years] within the jurisdiction of the court that the child: (*a*) is without necessary and proper physical or educational care and discipline; (*b*) is growing up under conditions or circumstances damaging to the child's sound character development; (*c*) lacks proper attention of the parent, guardian with care and custody or custodian; or (*d*) has a parent, guardian or custodian who is unwilling, incompetent or unavailable to provide any such care, discipline or attention, may issue a precept to bring the child before the court, shall issue a notice to the department and summonses to both parents of the child to show cause why the child should not be committed to the custody of the department or that any other appropriate order should not be made."

Court is required to enter a decree dispensing with the need for the consent to the child's adoption, if such decree would serve the best interests of the child, as defined by G. L. c. 210, § 3 (c).[8] See G. L. c. 119, § 26 (4). The decree effectively terminates the legal bond between parent and child. See G. L. c. 210, § 3.

The importance of the policy behind the statutory scheme — to protect children of the Commonwealth against "harmful effects resulting from the absence, inability, inadequacy or destructive behavior of parents or parent substitutes, and to assure good substitute parental care in the event of the absence, temporary or permanent inability or unfitness of parents to provide care and protection for their children" — cannot be overemphasized. G. L. c. 119, § 1. The child was living in Framingham. Her father brought her to the UMMC with serious and unexplained injuries. UMMC staff members were required by law to file a report with the department on reasonable cause to believe that her injuries were the result of abuse. See G. L. c. 119, § 51A. See *Care & Protection of Robert*, 408 Mass. 52, 63 (1990); *Parents of Two Minors v. Bristol Div. of the Juvenile Court Dep't*, 397 Mass. 846, 851 (1986). Once a report pursuant to G. L. c. 119, § 51A, had been filed, the department was required to investigate and, on reasonable cause to believe her removal necessary to protect her from further abuse, was required to file a petition pursuant to G. L. c. 119, § 24, on the next possible court day. See G. L. c. 119, § 51B (3). The

---

[8]According to G. L. c. 210, § 3 (c), the best interests of the child, for purposes of dispensing with the need for consent, depends on "the ability, capacity, fitness and readiness of the child's parent[] . . . to assume parental responsibility and . . . the plan proposed by the department." Relevant factors to be considered in determining parental fitness include the following:

"(ii) the child . . . has been abused or neglected as a result of the acts or omissions of one or both parents . . .

"(iv) the child is four years of age or older, a court of competent jurisdiction has transferred custody of the child from the child's parent[] to the department and custody has remained with the department for at least 12 of the immediately preceding 15-months and the child cannot be returned to the custody of [her] parent[] at the end of such fifteenth month period; provided, however, that the parents were offered or received services intended to correct the circumstance and refused or were unable to utilize such services on a regular and consistent basis."

Juvenile Court's jurisdiction over the matter stems from the child's presence in the Commonwealth and her obvious need of care and protection. This protection is mandated by G. L. c. 119 and does not depend on the immigration status of the child.[9]

The father argues, nonetheless, that the decree dispensing with the need for his consent to the child's adoption and the judge's approval of the department's proposed adoption plan violated Federal and international law. His primary complaint appears to be that, in light of the child's status as a foreign national, the judge erred in not considering Federal immigration law and international treaties. Thus framed, his argument presents essentially a question of choice of law, rather than one of jurisdiction. As such, it has been waived. See *Central Transp., Inc.* v. *Package Printing Co.*, *supra* at 189. In any case, his argument lacks merit.

We are aware of no Federal or international law that would operate to divest the Juvenile Court of the power to reach the result it did in these proceedings. There is no question that immigration law is strictly within the purview of Federal courts. See 8 U.S.C. § 1101 (2000). The judge, however, made no determination relative to the child's immigration status. Although it undoubtedly will change as a result of the termination of the father's parental rights, her new immigration status will have to be determined by the proper Federal authorities.

---

[9]We note that two State appellate courts, in circumstances quite similar to this case, have grounded jurisdiction on provisions of the Uniform Child Custody Jurisdiction Act (UCCJA), a uniform law providing for determinations of jurisdiction over child custody proceedings possibly involving jurisdictional claims of other States. 9 (Part IA) U.L.A. 261 (Master ed. 1999). See *In re Stephanie M.*, 7 Cal. 4th 295, 310-311, cert. denied sub nom. *Jose M.* v. *San Diego County Dep't of Social Servs.*, 513 U.S. 908 (1994) (finding "emergency jurisdiction" and that California was child's "home state" under California version of UCCJA); *Arteaga* v. *Texas Dep't of Protective & Regulatory Servs.*, 924 S.W.2d 756, 759-760 (Tex. Ct. App. 1996) (finding Texas was child's "home state" under Texas version of UCCJA). Massachusetts has adopted its own version of the UCCJA, see G. L. c. 209B, that, read literally, supports the Juvenile Court's jurisdiction in this case. See G. L. c. 209B, § 2 (*a*) (3) ("Any court which is competent to decide child custody matters has jurisdiction to make a custody determination . . . if . . . the child is physically present in the commonwealth and . . . it is necessary in an emergency to protect the child from abuse"). We think that the better view of this issue is expressed in the text of the opinion.

The details of how, and when, this may happen are matters that, as a State court, we do not discuss. We note, however, that Federal immigration law specifically recognizes the jurisdiction of State Juvenile Courts over determinations regarding the custody and best interests of children who have been abused or neglected, regardless of their immigration status. See 8 U.S.C. § 1101(a)(27)(J) (providing means by which child who has become ward of State due to abuse, neglect, or abandonment, may apply for permanent legal resident status); *Zhen-Hua Gao* v. *Jenifer*, 185 F.3d 548, 554 (6th Cir. 1999) ("[S]tate juvenile courts generally have jurisdiction over immigrant juveniles within their territory, whether legally admitted into the United States or not").

The father refers us to international law, contending that provisions of the Convention on the Rights of the Child (convention) preclude the actions taken by the judge. The convention, drafted by the Commission on Human Rights and adopted and ratified by the United Nations General Assembly without a vote on November 20, 1989, is a human rights treaty that seeks to protect not only the political and civil rights, but the economic and cultural rights of children all over the world. The convention is not binding on our courts because, although it has been signed, it has never been ratified by the United States.[10] See 10 United States Treaty Index: 1776-2000 Consolidation (rev. 2001); *Beharry* v. *Reno*, 183 F. Supp. 2d 584, 596 (E.D.N.Y. 2002). See also Dennis, Newly Adopted Protocols to the Convention on the Rights of the Child, 94 Am. J. Int'l L. 789, 790 n.8 (2000). We have read the entire text of the convention, nonetheless, and conclude that the outcome of the proceedings in this case are completely in accord with principles expressed therein. Of particular relevance is language contained in art. 3 ("[i]n all actions concerning children, whether undertaken by public or private social welfare institutions, courts of law, administrative authorities or legislative

---

[10]It is unclear what legal effect its provisions would have on State law in any case. See Sloss, The Domestication of International Human Rights: Non-Self-Executing Declarations and Human Rights Treaties, 24 Yale J. Int'l L. 129, 145-148 (1999) (questioning domestic legal status of certain international treaties in absence of implementing Federal legislation, "even if they are obligatory as a matter of international law").

bodies, the best interests of the child shall be a primary consideration") and in art. 19 ("[parties to the convention] shall take all appropriate legislative, administrative, social and educational measures to protect the child from all forms of physical . . . violence, injury or abuse . . . while in the care of parent(s) . . .").[11]

We reject the father's claim that the department's adoption plan violates art. 21 of the convention. Article 21 considers the topic of a country's adoption system in general, and does not appear to apply to the specific circumstance, such as here, where a State has taken custody of a child due to parental abuse. Nonetheless, regarding international adoptions, art. 21 states that "inter-country adoption may be considered . . . if the child cannot be placed in a foster or an adoptive family or cannot in any suitable manner be cared for in the child's country of origin." More to the point, art. 21 confirms that the paramount consideration of agencies placing children in adoptive homes, whether in their country of origin or abroad, must be "the best interests of the child." We conclude that the principles of children's rights, as expressed in the convention, do not conflict, and are in total agreement, with the termination of the father's parental rights, the decree dispensing with the need for his consent to the child's adoption, and the department's plan for her adoption by her foster parents, Mr. and Mrs. C.[12]

2. We consider the father's remaining claims that go to the

---

[11]There can be no doubt that the child's extensive injuries are encompassed by this language. The injury to her genitalia, euphemistically referred to by the judge as "female circumcision," is more commonly known as "female genital mutilation" and has been unequivocally condemned by Federal and international law as a violation of the rights of women and female children. See *Abankwah* v. *Immigration & Naturalization Serv.*, 185 F.3d 18, 23-26 (2d Cir. 1999), and authorities cited.

[12]Notification of authorities at the Indian consulate that the child, an Indian national, was the subject of custody proceedings, may have been in order. See art. 37 of the Vienna Convention on Consular Relations, 21 U.S.T. 77, 101, 102 (1963) (imposing duty on "competent authorities of the receiving State" to inform appropriate consular post of any case involving appointment of guardian for minor who is "a national of the sending State"). Whether such notification was given is not established in the record. Counsel for the child asserted at oral argument, without challenge, that the child's paternal grandmother had contacted the Indian consulate "one year ago." The Indian government has asserted no interest in this case, and notice pursuant to art.

merits of the trial. The father advances numerous arguments to support his challenge to the decree dispensing with the need for his consent to the child's adoption. Primarily, he asserts that the judge's determination of his parental unfitness was unsupported by clear and convincing evidence because it was based on factual findings that were substantially ("[m]ore than one-half") erroneous and on improperly admitted evidence. He argues as well that the judge failed to apply the proper legal standards, as required by G. L. c. 210, § 3, in concluding that severing his parental rights to the child, and allowing her adoption according to the plan proposed by the department, would be in the child's best interests.

The legal standard governing the judge's decision is well established. To determine whether to dispense with parental consent to adoption, a judge must evaluate whether the parent is currently unfit to assume the duties and responsibilities required of a parent and whether dispensing with consent will be in the best interests of the child. See G. L. c. 210, § 3; *Adoption of Georgia*, 433 Mass 62, 65-66 (2000); *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. 113, 119 (1984). Before a judge may award permanent custody of the child to the department, the judge must find, by clear and convincing evidence, that the natural parent is unfit to further the welfare and best interests of the child. See *Adoption of Mary*, 414 Mass. 705, 710 (1993); *Adoption of Kimberly*, 414 Mass. 526, 528-529 (1993); *Custody of Two Minors*, 396 Mass. 610, 619 (1986). Subsidiary findings must be proved by a fair preponderance of the evidence. See *Care & Protection of Laura*, 414 Mass. 788, 793 (1993). "Taken together, these facts must then prove parental unfitness, since it is the 'critical inquiry,' by clear and convincing evidence." *Id*. We will not disturb the judge's findings absent a showing that they are clearly erroneous. See *Care & Protection of Martha*, 407 Mass. 319, 327 (1990). We reject the father's challenges to the judge's decree for the following reasons.

(a) The department presented clear and convincing evidence of the father's unfitness. The judge listed seventy-nine detailed

---

37, or the lack thereof, would not have changed its outcome. See *id*. at 102 (notification acts without prejudice to operation of laws of receiving State).

and specific findings of fact. Almost without exception, the father's claims of error in these findings take issue with the judge's assessment of credibility and the weight of the evidence, to which we accord substantial deference.[13] See *Custody of Eleanor*, 414 Mass. 795, 799-800 (1993); *Custody of Two Minors*, 396 Mass. 610, 618 (1986). A subsidiary factual finding will only be set aside when it is unsupported by any evidence or when, "although there is evidence to support it, a reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Custody of Eleanor*, *supra* at 799, quoting *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977). No mistake has been made in this case; the judge's ultimate conclusion of parental unfitness is overwhelmingly supported by the record. See *Adoption of Helen*, 429 Mass. 856, 860 (1999). The department concedes that two minor findings may have been incorrect.[14] Because they relate only marginally, if at all, to the judge's ultimate conclusion of unfitness, we consider them harmless.

(b) During the course of the trial, the judge heard testimony from nineteen witnesses, and thirty-eight exhibits were entered in evidence. The father argues that the judge should not have permitted a department social worker to testify, over objection, regarding medical reports and statements of a physician and a social service worker in Colorado. The testimony was properly admitted. The witness merely acknowledged that she had spoken with persons in Colorado; had received facsimiles of certain medical reports from them; and had incorporated the reports

[13]The father assails, for example, the judge's finding that he failed to cooperate with the development of a service plan after the child was placed in the temporary custody of the department (a finding directly supported by a department social worker's testimony). The father also attacks the judge's determination that the department made reasonable efforts to find a Telegu interpreter and a Telegu or Hindu foster home (a finding supported by the testimony of two department social workers that such efforts had in fact been made).

[14]These two findings were that (1) M.H. became the child's primary caretaker after her marriage to the father on September 12, 1997 (testimony at trial indicated that child's paternal grandmother was primary caretaker until child and M.H. followed the father to the United States on October 17, 1998); and (2) the child's genital injuries had been inflicted within approximately two weeks of her examination at UMMC (child's pediatric surgeon testified that mutilation most likely occurred within one week of admission).

into her investigative report filed pursuant to G. L. c. 119, § 51B, substantiating the UMMC's report of suspected abuse. The § 51B report itself was admissible to explain the genesis of the filing of the care and protection petition. The witness did not testify concerning the contents of the Colorado documents, and, because the documents themselves were not offered in evidence, no certification, or other authentication, was required. The judge's findings concerning the child's injury and treatment in Colorado could have been based on the father's own testimony, or on testimony of M.H. on the matter, which was admitted without objection.

The father also claims error in the admission in evidence of copies of three medical reports evaluating the child's injuries and treatment at UMMC. The copies of the reports were not certified, as required by G. L. c. 233, § 79. The surgeon who wrote the reports, however, authenticated them and testified extensively, subject to cross-examination, as to their substance. The information contained in the reports thus was fully corroborated, and any error in their admission in evidence was nonprejudicial. See *Commonwealth* v. *Gogan*, 389 Mass. 255, 263 (1983).[15]

(c) In determining whether the best interests of a child will be served by issuing a decree dispensing with the need for consent, a judge must consider "the ability, capacity, fitness and readiness of the child's parent[] . . . to assume parental responsibility," as well as "the plan proposed by the department or other agency initiating the petition." G. L. c. 210, § 3 (*c*). The father's claim that the judge's written conclusions of law indicate that "scant attention [was paid] to the evidence before [the court]" has no merit. The judge's factual findings were specific and detailed, demonstrating to us that close attention

---

[15]The judge acted permissibly in granting the department's motion to quash the father's subpoena for the child's appearance as a witness at the trial. Contrary to the father's argument, the judge was not required to hear testimony of the child. See G. L. c. 119, § 21 (permitting testimony of subject of care and protection petition on the judge's determination that the child is competent and willing to testify). In the circumstances of this case, the judge properly could have concluded that any such testimony could evince no evidence of probative value sufficient to outweigh the likelihood of further trauma to the child.

was given to the evidence and that the statutory factors listed in
G. L. c. 210, § 3 (*c*), were properly considered. See *Adoption of
Hugo*, 428 Mass. 219, 224 (1998), cert. denied sub nom. *Hugo
P.* v. *George P.*, 526 U.S. 1034 (1999). The judge's findings
firmly establish that the child suffered severe trauma inflicted
while she was in the sole care and custody of the father and his
wife. There was no evidence whatsoever on which the judge
could find that the child, if returned to her father, would not
continue to be subjected to physical abuse. At the time of the
judge's decision, the child had been in foster care for ap-
proximately nineteen months and had formed a strong positive
bond with her foster parents, Mr. and Mrs. C. The judge was
fully warranted in concluding that the father was unfit to as-
sume parental responsibility for the child. On the facts of this
case, a conclusion other than the one reached by the judge
might have constituted error.

The judge also made specific findings reflecting careful evalu-
ation of the suitability of the department's proposed plan for the
child's adoption. We mention just a few. The judge found that
(1) "Mr. and Mrs. C. displayed remarkable dedication to meet-
ing [the child's] extraordinary needs . . . rang[ing] from a
willingness to soothe her on a nightly basis during her sleep
disturbances, to ensuring that the other children in their home
were sensitive to [her] needs and played with her"; (2) "[the
child] ha[d] become an integral part of the foster family, with a
strong attachment to Mr. and Mrs. C. and their children"; and
(3) "[u]nder the care of Mr. and Mrs. C., [the child's] symptoms
of post-traumatic stress disorder have almost entirely abated."
Even the father's expert witness, presented with a hypothetical
situation substantially mirroring the facts of this case, agreed
that the severance of the bond between a child and her foster
family could cause significant emotional harm to the child.

There is nothing in the record indicating that the grandmoth-
er's request for custody of the child was not accorded proper
consideration. The judge took note of the significant attachment
between the child and her grandmother, but recognized that it
had been nearly two years since their separation. The judge
obviously, and appropriately, sought to determine which place-
ment would be in the child's best interests. See *Adoption of*

*Hugo, supra* at 226-227. The judge's determination that the plan of adoption submitted by the department was in the child's best interests presents "a classic example of a discretionary decision" to which we accord substantial deference. *Id.* at 225, quoting *Adoption of a Minor (No. 2)*, 367 Mass. 684, 688 (1975).

3. The decree dispensing with the father's consent to adoption is affirmed.

*So ordered.*