The father of Bedelia appeals from a decree of the Juvenile Court terminating his parental rights and ordering up to two supervised visits per year. He contends (1) that the judge abused her discretion by denying his request for a continuance of the trial, (2) that several of the judge's factual findings are clearly erroneous, undermining her ultimate termination decision, and (3) that the judge abused her discretion by terminating the father's parental rights and ordering only two visits per year. We affirm.
Discussion. 1. Denial of continuance. The Department of Children and Families (DCF) initiated care and protection proceedings on June 3, 2015, upon the father's arrest on charges of violence against a household member, his father (paternal grandfather). The father was arraigned on another set of charges and held until June 27, 2015, when he was given a suspended two-year sentence and a term of probation. Within a few months he violated the terms of probation and was imprisoned; he remained incarcerated until February, 2017.
The same judge presided over this case from its inception. She originally scheduled trial for January 11, 2017. On that date the father requested a continuance until April or May, after his release from prison, to give him time to "set himself in a situation where he can take care of [Bedelia]." DCF did not object, but counsel for the child pressed for an earlier date, arguing that "the child needs resolution, legal resolution. She's been in legal limbo for two years." The judge continued the trial to March 23, 2017. On that date, with the father present, the judge allowed the parties' joint request for a continuance until April 25, 2017, with "[n]o further continuances."
The father was not present when trial commenced on April 25, 2017. The father's counsel submitted exhibits and called his first witness, clinical psychologist Dante Spetter. After DCF put on its two witnesses and the judge denied the father's motion for a directed verdict, the father's counsel expressed his desire to call the father as a witness. Because the father was not present and counsel could not explain his absence, counsel asked for a further continuance. The judge denied the motion, noting that the father was present in court when she set the trial date and stated there would be no further continuances.
"The decision on whether to continue any judicial proceeding is a matter entrusted to the sound discretion of the judge, and the judge's decision will be upheld absent an abuse of that discretion." Adoption of Gillian, 63 Mass. App. Ct. 398, 409-410 (2005). The father offered no reason or explanation for his absence at trial and made no claim that it was caused by circumstances beyond his control. See Adoption of Talik, 92 Mass. App. Ct. 367, 372-373 (2017) ; Care & Protection of Quinn, 54 Mass. App. Ct. 117, 122 (2002). Moreover, "[o]ther interests, specifically the paramount interests of the children involved, argued against the delay." Care & Protection of Quinn, supra. The father was represented by counsel and had a meaningful opportunity to be heard. Id. He has not shown that the judge abused her discretion.[3]
2. Factual findings. "In determining whether to dispense with parental consent to adoption, a judge must 'evaluate whether the [parent is] able to assume the duties and responsibilities required of a parent and whether dispensing with the need for parental consent will be in the best interests of the child[ ].' " Adoption of Nancy, 443 Mass. 512, 514 (2005), quoting Adoption of Mary, 414 Mass. 705, 710 (1993). See G. L. c. 210, § 3 ; Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). The judge must conduct a two-part analysis: the judge must first determine "parental unfitness by clear and convincing evidence," and "[a]fter ascertaining unfitness, the judge must determine whether ... it would be in the child's best interests to end all legal relations between parent and child." Adoption of Nancy, supra at 515. The two inquiries "are not separate and distinct, but 'reflect different degrees of emphasis on the same factors.' " Id., quoting Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 641 (1975). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011).
The judge concluded that the father's persistent problems with substance abuse, criminal activity, domestic violence, and housing rendered him an unfit parent, and that these issues would continue unabated in the future. The father argues that four of the judge's subsidiary findings were clearly erroneous, undermining her ultimate conclusion.
Before terminating parental rights, the judge must "make specific and detailed findings, demonstrating that close attention has been given to the evidence." Adoption of Gregory, 434 Mass. 117, 126 (2001). The judge's subsidiary findings of fact must be supported by a preponderance of the evidence and will not be disturbed unless clearly erroneous. Id. A subsidiary finding is clearly erroneous when there is no evidence to support it, or when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Custody of Eleanor, 414 Mass. 795, 799 (1993), quoting Building Inspector of Lancaster v. Sanderson, 372 Mass. 157, 160 (1977).
a. Housing instability. The facts showed clearly and convincingly that the father was unable to provide stable housing for Bedelia. He removed her from Florida to the paternal grandfather's home in East Boston to shelter her from the mother's violence and other issues, yet he soon allowed the mother to move in with them, against the paternal grandfather's wishes, resulting in a chaotic household. The mother's arrival led to a domestic violence incident between the father and the paternal grandfather. The father's consequent arrest left the child and the mother homeless. After this incident, the father stayed with friends in Lynn and Salem until his imprisonment. Upon his release he went back to live with the paternal grandfather. He cancelled an attempted home visit by DCF on March 21, 2017, because he had to work -- yet on that same day he quit the job he had held for only two weeks. Three days before trial he claimed to have obtained housing in Melrose, a fact that DCF could not verify, largely because the father did not respond to the social worker's attempts to contact him.
The father argues that the judge erred by finding that he "refused" to schedule a home visit. While describing the father's lack of diligence in scheduling home visits as a "refusal" may be an overstatement, the facts, combined with the father's inability to secure employment or income, clearly and convincingly demonstrate the father's inability to provide a stable home for the child, or even for himself.
b. Substance abuse. The father's substance abuse problems, and his inconsistent and unsuccessful attempts to comply with treatment programs, are well documented. The father claims that the judge's findings in this regard are undermined by her erroneous conclusion that he had a "history of rescinding releases," where the record demonstrates only one such rescission. However, the record also shows that he failed to provide documentation of his completion of Alcoholics Anonymous and Narcotics Anonymous programs, with no explanation for his failure to do so, and that the social worker who was assigned to the father since his release from prison was denied information about his treatment at the Medicated Assisted Pathway program because her name was not on the release form. The record supports the judge's determination that the father's substance abuse was a serious shortcoming that repeatedly put the child's welfare at risk.
c. Domestic violence. The record supports the judge's finding that the relationship between the father and the mother was "permeated with domestic violence."[4] An incident of the mother slapping the father in the face prompted him to relocate to Massachusetts with the child, yet he soon allowed the mother to move in with them. This, in turn, led to another instance of domestic violence, between the father and the paternal grandfather. The child witnessed both of these incidents. The facts support the judge's determination that domestic violence was a factor in the parents' relationship, and that the father has not adequately endeavored to address it. See Custody of Vaughn, 422 Mass. 590, 595 (1996) ("[P]hysical force within the family is both intolerable and too readily tolerated, and ... a child who has been either the victim or the spectator of such abuse suffers a distinctly grievous kind of harm").
d. Missed visit. Finally, the father takes issue with the judge's characterization of his visits with Bedelia as "inconsistent," where he only missed one scheduled visit, on April 21, 2017. That, however, was a crucial visit, on the eve of trial, and his unexplained failure to attend the visit, coupled with his unexplained absence from trial, indeed demonstrate an inconsistent commitment to his parenting responsibilities. In addition, the father's disciplinary infractions while incarcerated resulted in the postponement or rescheduling of a number of visits.
Based on our careful review of the record and of the judge's detailed and comprehensive findings, we conclude that the termination decision "reflect[s] an even-handed assessment of all the relevant facts." Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, 376 Mass. 252, 261 (1978). Notwithstanding a few instances of hyperbole, the judge's ultimate conclusion has clear and convincing evidentiary support. See Adoption of Peggy, 436 Mass. 690, 702 (2002) (while "two minor findings may have been incorrect," "[b]ecause they relate only marginally, if at all, to the judge's ultimate conclusion of unfitness, we consider them harmless"); Care & Protection of Olga, 57 Mass. App. Ct. 821, 825 (2003) ("The two clearly erroneous findings, considered singly or in the aggregate, are not central to the ultimate conclusion of unfitness. Even without those findings, that conclusion has clear and convincing evidentiary support").
3. Termination and visitation decisions. The father argues that the judge's decision to terminate his parental rights was premature, as he had only recently been released from imprisonment and was making efforts to comply with his service plan. While "[a] judge may properly be guided by evidence demonstrating reason to believe that a parent will correct a condition or weakness that currently disables the parent from serving his or her child's best interests," Adoption of Carlos, 413 Mass. 339, 350 (1992), the evidence clearly and convincingly supports the judge's conclusion, based on the father's history and his more recent conduct in prison and after his release, that his "shortcomings will continue undiminished in the future."
Nor did the judge abuse her discretion in ordering posttermination visitation two times per year. The judge credited psychologist Spetter's opinion that the child had a "secure attachment" to the father, and noted Spetter's opinion that keeping the father as an ongoing presence in the child's life would "help mitigate risks, if any, associated with [the father's] potential separation." The judge also found a strong bond between the child and her foster parents (who planned to adopt her). The judge appears to have erred in finding that "Dr. Spetter did not form an opinion as to whether [Bedelia] formed a positive attachment to Father or the foster parents first" -- Spetter in fact testified that the father was the child's "[p]rimary as in first" attachment figure. Taking all the evidence into account, the judge concluded that "posttermination and post-adoption visitation with Father is in [Bedelia's] best interest." The judge ordered "up to two visits per year," subject to review based on the adoptive parents' assessments and the child's wishes.
The judge's order demonstrates that she did not, as the father argues, ignore the attachment evidence. Although Spetter testified that two visits would be better than none, and that weekly or biweekly visits would be ideal, the judge was not obligated to adopt his recommendation. A judge must balance the benefit of an order of visitation with the intrusion that such an order imposes on adoptive parents, "who are entitled to the presumption that they will act in their child's best interest." Adoption of Ilona, 459 Mass. at 64-65. "[T]he judge considered the relevant factors and her decision did not 'fall[ ] outside the range of reasonable alternatives.' " Adoption of Garret, 92 Mass. App. Ct. 664, 676-677 (2018), quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).
"In sum, while we appreciate that the [father] has made commendable efforts and has shown concern and affection for [Bedelia], we conclude that the judge did not abuse [her] discretion or commit a clear error of law in determining that the [father] is unfit, that [his] condition is not temporary, and that termination of [his] rights is in [Bedelia]'s best interests." Adoption of Jacques, 82 Mass. App. Ct. at 609.
Decree affirmed.

The judge also acted within her discretion in drawing an adverse inference from the father's unexplained absence. See Adoption of Talik, supra at 371-373.

The judge also wrote that the mother and the father "have a long history of substance abuse, domestic violence, criminality, housing instability and inability to care for their child." While "long history" may not be an accurate descriptor of the parents' domestic violence, it is accurate as to all the other factors referred to in the sentence.