NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1013

ADOPTION OF FARRELL (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The parents appeal from decrees entered in the Juvenile Court terminating their parental rights with respect to their two youngest children, Farrell and Amy.  The parents challenge both the ultimate conclusion of unfitness and several of the factual findings on which it stands.  The mother additionally asserts that the Department of Children and Families (department) failed to make reasonable efforts to reunify the family.  We affirm.

1.  Contested findings.  We begin by addressing the parents' claims that several of the trial judge's findings of fact were clearly erroneous, stale, or incompatible with an even-handed assessment of the evidence.  "In proceedings to

---

[1] Adoption of Amy.  The children's names are pseudonyms.

dispense with parental consent to adoption, the judge must make specific and detailed findings demonstrating that close attention has been given to the evidence." Adoption of Quentin, 424 Mass. 882, 886 (1997). Subsidiary findings of fact must be supported by a preponderance of the evidence. See Care & Protection of Laura, 414 Mass. 788, 793 (1993).

"A finding is clearly erroneous when there is no evidence to support it, or when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (quotation and citation omitted). Custody of Eleanor, 414 Mass. 795, 799 (1993). "[T]he judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference." Id.

a. The mother's sobriety. Both parents argue that the judge erroneously discredited the mother's assertion that she had overcome her use of substances "cold turkey" because the evidence did not establish exactly when she had last used substances or whether she was still using them at the time of trial. We see no basis on which to disturb the judge's credibility determination. The judge was not required to make a specific finding on the mother's last known date of substance use before finding that she had "not made or maintained any observable changes regarding her mental health or substance

2

abuse."  This finding was supported by a fair preponderance of evidence, including the mother's lack of a recovery program and the father's inconsistent cooperation with the department in fashioning a relapse prevention plan for the mother.  See Adoption of Jacques, 82 Mass. App. Ct. 601, 606-607 (2012).

In light of the mother's noncompliance with inpatient and outpatient programs, as well as her failure to consistently complete action plan items with respect to substance abuse, the mother's argument that direct evidence of her drug use was stale or unfounded is meritless.  The judge's finding that monthly drug screening was insufficient to keep the mother's substance abuse in check was not clearly erroneous.  See Care & Protection of Vieri, 92 Mass. App. Ct. 402, 406 (2017) ("The judge was permitted to draw a negative inference from the mother's unexplained refusal to cooperate with the department").

b.  Marijuana use.  The father challenges the finding that he gave the mother marijuana in addition to what she procured for herself.  At trial, he testified that he did not supply her with marijuana and that she obtained her own from a dispensary -- although he did admit that he took her to the dispensary every time she went.  The discrepancy between the judge's finding and the evidence is minor.  In any event, the parents' marijuana acquisition and use carried little weight in the

judge's conclusion of unfitness, which focused on the mother's unaddressed misuse of stronger substances.

c.   The father's criminal history and police interactions. The father contends that the judge's finding that he "has a criminal history and significant police interaction" is clearly erroneous because all criminal charges against him were dismissed or nolle prossed.  He also takes issue with the judge's use of the mother's abuse protection orders against him as a basis for finding that he had a criminal history.  We agree that the finding that he had a criminal history was clearly erroneous.  However, the evidence -- including the dismissed assault and battery charges from 2013 and 2017 -- does support the judge's finding that he had "significant police interaction."

d.   Relapse prevention plan.  The father challenges the finding that in July 2020, after the department asked him to develop a relapse prevention plan for the mother, he "articulated several reasons why he had not provided one, including that he did not want to, he was unable to speak with Mother's providers, [and] he was not understanding why it was needed."  The judge's finding that the father did not understand "why it was needed" is a plausible interpretation of the testimony of the ongoing social worker, who listed "not understanding" as one of the reasons the father did not provide

4

a plan.  The finding with respect to this particular conversation in July 2020 is not clearly erroneous.  We do note that the father was a party to numerous "conversations pertaining to safety planning around Mother's relapse prevention plan."

e.  Domestic violence.  The facts reveal a volatile relationship between the parents.  They obtained several abuse prevention orders against each other between 2011 and 2019.[2]  In July 2021, the father "reported that he was going to leave the home in fear for his own safety," and with referrals from the department, he called two domestic violence hotlines for advice.  While recognizing that there was no direct "evidence of physical force between the parents," the judge concluded that "the level of mental and emotional abuse enacted by them upon each other is indeed domestic violence."

We agree with the father's contention that there was no evidence of physical force or violence that would equate to "domestic violence" for purposes of determining parental unfitness.  See Custody of Vaughn, 422 Mass. 590, 595-596 (1996).  The relationship may have been "toxic and codependent" in the sense that the parents repeatedly sought distance from each other and that the father was more of a negative than a

---

[2] The orders, and the factual bases for them, are absent from the record appendix.

5

positive influence on the mother's deficiencies as a parent. At trial, the father admitted that the mother could be manipulative in the sense that "[i]f she doesn't get . . . something she wants, she, you know, gets angry," and sometimes did so when their three eldest children were present.[3] The issuance of abuse prevention orders against him is evidence that the mother experienced a reasonable fear of imminent physical harm from the father, and the father acknowledges that the department had concerns about the mother perpetrating domestic violence against him. The judge had a responsibility to examine the issue closely and make explicit findings. See id. at 599-600. While troubling and relevant to the ultimate finding regarding the children's best interests, these facts do not establish a pattern of physical force or violence to justify the label of domestic violence.

f. Special needs. Both parents challenge the judge's findings that Farrell and Amy each have significant special needs requiring attention and care that "neither parent is prepared to effectuate." Farrell has been diagnosed with attention deficit hyperactivity disorder and receives social and emotional support through an individualized education program.

---

[3] The parents rights to their three eldest children were previously terminated, and those children were not a part of this proceeding. See part 2.a, infra.

6

Amy receives early intervention services, "occupational therapy, physical therapy, and speech therapy" as a result of substance exposure at birth, and she has shown symptoms of a milk allergy and a relatively minor skin condition. Both children are receiving appropriate care and resources from their preadoptive caregivers. The judge's findings in this regard are not erroneous.

2. Parental fitness and children's best interests. Even if some subsidiary findings are erroneous, the judge's ultimate conclusion may still be "amply supported" by evidence of a parent's unfitness. Adoption of Helen, 429 Mass. 856, 859 (1999). We summarize the findings of fact underlying the judge's ultimate conclusions, discarding any clearly erroneous findings. Where necessary, we supplement the judge's findings with evidence from the record appendix, and we reserve certain facts for later discussion.

a. Background. The mother has lost her parental rights with respect to all seven of her children.[4] She had two children before her relationship with the father began. She gave birth to her first child in 1996, when she was a teenager. That child

_____

[4] The judge's finding that the mother "has given birth to six children," rather than seven, is clearly erroneous. The error is immaterial, however, where the findings referred to all seven children by name and, in any event, the exact number of children born to the mother has no bearing on the ultimate issues here.

7

was removed by the department and adopted after an alleged domestic violence incident with that child's father in 2000. The department removed her second child, born in 2006, because he was exposed to controlled substances at birth. That child was later adopted. The parents' relationship began sometime between 2006 and 2009, and they had three children together between 2010 and 2012. The parents' rights to their first three children were terminated after a trial in 2015. Farrell, born in June 2016, and Amy, born in November 2019, are the parents' fourth and fifth children together. They were born substance-exposed and have been in the department's custody since days after their births.[5]

The mother has suffered from significant substance abuse and mental health issues for most of her life. She dropped out of school following the seventh grade. She started using cocaine and "crack" cocaine at age twenty-one and heroin at age thirty-one. She has intermittently received methadone treatments since 2010 and was attending methadone clinics around

---

[5] Farrell tested positive for marijuana and methadone at birth and suffered withdrawal symptoms in the hospital. The mother admitted to using heroin, cocaine, and marijuana during the pregnancy. Amy tested positive for methadone at birth, but she showed no withdrawal symptoms. The mother admitted to using heroin, "crack" cocaine, and marijuana while she was pregnant with Amy. The mother also tested positive for the same substances, as well as methadone, benzodiazepines, and fentanyl, earlier in the pregnancy.

the time of trial.  Still, she continued using heroin and marijuana during treatment, and by the time of trial, she had "no recovery program or services other than medication maintenance and (approximately) monthly urine screens."  The judge discounted any deterrent effect of urine screens because, in 2016, the father reported that the mother was likely storing urine to defeat the probation department's drug tests.

The mother has a notable history of crime and encounters with law enforcement.  She has been convicted of possession and distribution of cocaine and assault and battery by means of a dangerous weapon.  Charges of larceny, attempted larceny, and uttering a false check were continued without a finding.  At the time of trial, there were multiple open criminal charges against her for possession of heroin and cocaine, driving with a suspended license, and leaving the scene of an accident after causing property damage.  The judge permissibly drew a negative inference from the mother's assertion of her privilege against self-incrimination when questioned about her arrests and open charges.  See Custody of Two Minors, 396 Mass. 610, 616 (1986).  Unlike the mother, the father does not have a criminal record or a pattern of serious substance abuse, although he has had "significant police interaction" and uses marijuana daily, likening it to "sipping coffee."

9

Both parents have struggled to maintain adequate income and stable housing. The mother's mental health conditions qualify her for Social Security disability income, which, around the time of trial, she supplemented with earnings from two supervisory retail positions. The father, despite holding a master's degree and a doctorate in music, has had "a long history of homelessness and housing instability," as well as financial instability. He has been employed as a delivery driver and part-time music teacher.

During the care and protection proceedings for their first three children, the parents were unable to consistently maintain electricity, hot water, or clean living conditions in the family home. In October 2015, they absconded with the three children to South Carolina without notifying the department, family members, the children's school, or any collateral resources. They moved "primarily to evade" the department and "had no secured housing, no services in place, and nowhere to settle once they reached South Carolina." The judge did not credit the father's testimony that he thought they were permitted to leave the State with the three older children, nor did she credit either parent's testimony that the mother was sober and did not suffer from withdrawal symptoms on the way to South Carolina. To the contrary, the father had to bring the mother to a hospital at least twice for emergency doses of methadone. Six

days after they left Massachusetts, the parents were arrested by South Carolina police for possession of controlled substances. Department social workers flew to South Carolina to retrieve the three children, took custody of them, and placed them in foster care. The parents followed the three children to Massachusetts. As noted, the parents' rights to those children were eventually terminated.

After Farrell's birth, the parents continued to experience housing instability. During parts of 2018 and 2019, the parents lived in the father's van, and police officers responded to calls for wellness checks. While pregnant with Amy in 2019, the mother entered a residential treatment program for three months. By the time she left the program and gave birth to Amy, she had separated from the father and started using substances again. She stayed in hotels and "sometimes in a car" during this period. By the spring of 2020, about one year before trial, the parents had reconciled and were living at a shelter in Northampton and at times in a boarding house in Springfield. Violence and substance abuse by the other residents, as well as the mother's conflicts with other residents, drove the father to leave on his own and seek housing assistance from the department. The parents reconciled again at some point and lived in an apartment in Westfield.

In November 2020, the parents moved to Granby, Connecticut, where they stayed at a motel for "a couple of months" before leasing an apartment on a month-to-month basis. The father hoped to distance the mother from her addiction "triggers" in Westfield, about one-half hour's drive away. They resided in the Granby apartment at the start of trial. However, after their relationship with the landlord deteriorated, the parents lost the Granby apartment in March 2022, while the trial was ongoing. They failed to attend a virtual home visit scheduled for the day after their tenancy ended. At the conclusion of the trial, the parents' living situation was unknown.

The parents' relationship and marriage have been turbulent. The marriage began in May 2013. The father filed for his first abuse prevention order against the mother just two months later. They have separated at least twice, and the father has filed for divorce at least three times. While there is virtually no evidence of physical domestic violence,[6] the

_____

[6] The only arguable instance of physical domestic violence was when, in 2018, the mother went to a police station and reported that the father had pulled her out of his van "with force" following an argument. She left the station before the police could obtain a formal statement. During a wellness check the following month, neither parent reported any concerns about domestic violence. As noted earlier, however, the parents' successful applications for abuse prevention orders against each other suggests that the threat of imminent physical harm arising from the tension in their relationship was present at various times.

father has struggled to set appropriate boundaries to protect the children from the effects of the mother's mental health and substance abuse. The father's divorce attempts were apparently meant to distance himself from the mother's conduct. He reported the mother's substance abuse incidents to the department at least twice. Still, the parents remained committed to each other at the time of trial. The father has consistently reconciled with the mother to help "keep her in the game" so that she may one day be "around and healthy" for the children. Indeed, the parents testified that they intended to parent Farrell and Amy as a couple.

Both parents failed to cooperate with the department or show consistent compliance with their action plans. They refused to meet with department employees or sign releases for services following Farrell's initial removal in 2016. The mother inconsistently attended individual counselling and did not follow through with a psychological evaluation, treatment, early intervention services, or her parenting group. She has not cooperated with the department since December 2020. By the time of trial, she "ha[d] not made or maintained any observable changes regarding her mental health or substance misuse." While the father made more progress on the items identified in his action plans, namely mental health and marijuana use, he declined to sign off on nearly every action plan, and he

13

disputed most of the action items before he joined the mother in refusing to cooperate further.  Finally, the parents moved to Connecticut to avoid interacting with the department.

b.  Discussion.  "To terminate parental rights . . . a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests."  Adoption of Jacques, 82 Mass. App. Ct. at 606.  In so finding, the judge "shall consider the ability, capacity, and readiness of the child's parents . . . to assume parental responsibility (emphasis added)."  Adoption of Elena, 446 Mass. 24, 31 (2006), quoting G. L. c. 210, § 3 (c).  Parental unfitness is not merely "ineptitude, handicap, character flaw, conviction of a crime, unusual life style, or inability to do as good a job as the child's foster parent.  Rather . . . parental unfitness means grievous shortcomings or handicaps that put the child's welfare much at hazard" (citations omitted).  Adoption of Darlene, 99 Mass. App. Ct. 696, 702 (2021).  Whether termination of parental rights is in a child's best interests is within the trial judge's discretion.  See Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999).  On appeal, "we must determine whether the trial

14

judge abused [her] discretion or committed a clear error of law."  Adoption of Elena, supra at 30.

i.  Termination of the mother's parental rights.
Discounting the few erroneous factual findings, the judge's decision that the mother is unfit to parent falls well within "the range of reasonable alternatives" (citation omitted). Adoption of Xarissa, 99 Mass. App. Ct. 610, 616 (2021).  The record contains voluminous evidence of the mother's substance use and mental health concerns, past and pending criminal record, housing instability, and refusal to cooperate with the department.  Farrell and Amy, as substance-exposed newborns, have been in the department's custody virtually since birth and have never lived with the mother or the father.  The children have strong bonds and are thriving in their preadoptive homes. The judge properly considered the mother's likely inability to meet the children's special needs, as compared to the proven capability of the preadoptive caregivers.  The judge did not abuse her discretion in weighing these factors to find the mother unfit.

The mother argues that the judge's conclusion of parental unfitness was unsupported by clear and convincing evidence that her substance use and mental health struggles prevented her from providing the children with minimally acceptable care. Substance abuse during and after pregnancy, even involving

15

cocaine and similarly dangerous illegal substances, cannot be the sole ground for terminating parental rights without evidence that the parent "provide[d] less than minimally acceptable care" for the child. Adoption of Katharine, 42 Mass. App. Ct. 25, 31 (1997). Here, however, the record contains ample evidence of a nexus between the mother's substance use and mental health issues and her ability to parent.

The judge was within her discretion to consider the mother's decades-long pattern of substance abuse, tendency to relapse, and apparent willingness to flee the jurisdiction of both the department and the Juvenile Court. See Adoption of Elena, 446 Mass. at 33. We defer to the judge's decision not to credit the mother's testimony that she had become sober and had stopped using illegal substances "cold turkey." See part 1.a, supra. The mother failed to make consistent progress in addressing her mental health conditions to assure either the department or the judge that she could provide the children with a baseline level of care. The judge was entitled, if not required, to view the mother's mental health struggles as evidence of unfitness. See, e.g., Adoption of Gwendolyn, 29 Mass. App. Ct. 130, 133-134 (1990). "A judge . . . need not wait for disaster to happen but may rely upon past patterns of parental neglect or misconduct in determining current or future

16

fitness."  See Adoption of Virgil, 93 Mass. App. Ct. 298, 301 (2018).

The mother also takes issue with the judge's conclusion that, despite completing some action plan items, she "has not demonstrably benefitted from . . . parenting education," arguing that the judge disregarded evidence that the mother applied her parenting education during visits with the children.  Although the mother's conduct during visits was generally appropriate, a host of other factors weighed heavily in favor of unfitness. See Adoption of Virgil, 93 Mass. App. Ct. at 303.  There is ample evidence that the mother's compliance with her action plan was inadequate.  She not only failed to participate in the department's services, but intentionally evaded and circumvented them by leaving the State with the eldest three children and falsifying urine screens.  In fact, she conceded her noncompliance, claiming she was fit nonetheless.  The mother's failure to comply with or make tangible progress on her action plan properly supported the judge's finding of unfitness.  See id. at 302 ("A judge may not decline to dispense with consent based on a faint hope that the family will succeed if reunited").  The judge did not err in assigning little weight on the mother's agreeable behavior during visits.  In short, the mother's appellate arguments "amount to no more than a disagreement with the judge's weighing of the evidence and

17

credibility determinations regarding witnesses." <u>Adoption of Don</u>, 435 Mass. 158, 166 (2001).

ii. <u>Termination of the father's parental rights</u>. The father asserts that, absent the erroneous factual findings, the remaining facts were insufficient to support a finding of unfitness. He maintains that he "was sober, maintained a home for his children, was employed," and "consistently took appropriate steps to ensure the home his children would return to was safe by maintaining constant vigilance for a relapse by mother." While the facts do not establish that the father had a substance use problem or was consistently unemployed, they overwhelmingly support the judge's findings that the father was unable to prevent the mother from relapsing or maintain stable and appropriate housing for the children.

We recognize that codependency within a committed relationship is not proof of unfitness. Even so, under these circumstances, the parents' enduring commitment to each other conflicted with the best interests of the children. We must defer to the judge's conclusion that the father is unable to set appropriate boundaries with the mother. Where the father argues that the judge "erroneously discredited" his "efforts to live up to his obligations to his children and his wife," the judge's findings to the contrary were well within her discretion and

18

entitled to our deference. See Care & Protection of Three Minors, 392 Mass. 704, 711 (1984).

Finally, we are not persuaded by the father's claim that a single instance of the judge mixing up the preponderance of the evidence standard, applicable to subsidiary facts, with the clear and convincing evidence standard, applicable to the ultimate conclusions regarding unfitness and best interests, betrayed a "lack of attention" throughout the decision. This isolated error was harmless, as the judge repeatedly, in every other instance, stated the correct standard. See Adoption of Peggy, 436 Mass. 690, 702 (2002).

3. Reasonable efforts. The mother argues that the judge erred in terminating her parental rights where the department failed to make reasonable efforts to assist with reunification. See G. L. c. 119, § 29C; Care & Protection of Walt, 478 Mass. 212, 221 (2017). Where, as here, "the parent's consent to adoption of a sibling of the child was dispensed with under [G. L. c. 119, § 26, or G. L. c. 210, § 3], or the parent's rights were involuntarily terminated in a case involving a sibling of the child," reasonable efforts are not required. G. L. c. 119, § 29C (ii). See Care & Protection of Walt, supra at 222; Adoption of Ilona, 459 Mass. 53, 60 n.10 (2011). See also 42 U.S.C. § 671(a)(15)(D)(iii) (reasonable efforts not

required if "the parental rights of the parent to a sibling have been terminated").

Decrees affirmed.

By the Court (Green, C.J.,
  Vuono & Massing, JJ.[7]),

Clerk

Entered:  August 8, 2024.

---

[7] The panelists are listed in order of seniority.