Rel: May 10, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2023-2024

———————————————

### CL-2023-0102

———————————————

### M.G.S.

### v.

### Lee County Department of Human Resources

### Appeal from Lee Juvenile Court
### (JU-19-311.02)

HANSON, Judge.

In 2018, D.G.-L. ("the father") came to the United States from Guatemala and brought with him D.G. ("the child"), the oldest child born of his marriage to M.G.S. ("the mother").[1] The mother and the father's

—————————————

[1]In the record, the mother is alternately identified as "M.S.G."

two younger children remained in Guatemala. In September 2019, the father caused a motor-vehicle accident while the child was a passenger in the vehicle. It does not appear that the child was injured in that motor-vehicle accident. However, as a result of that accident, the father was arrested on several charges, including driving under the influence. At the time of the accident, the mother was in Guatemala and there were no other relatives in the United States with whom the child could reside, so the Lee County Department of Human Resources ("DHR") filed in the Lee Juvenile Court ("the juvenile court") a petition seeking to have the child declared dependent and seeking an award of pendente lite custody of the child.

In the dependency action, the juvenile court entered an order on October 15, 2019, in which it found the child dependent. DHR provided reunification services to the father, and in the summer of 2020, the reunification plan was for the child to be returned to the father's custody. However, for reasons not made clear in the record, that reunification plan changed in September 2020. The new reunification plan for the child was to return the child to the mother in Guatemala, and attempts were made to conduct a home study on the mother's home. In August 2022, the

2

juvenile court entered an order in the dependency action in which it, among other things, approved another change in the reunification plan for the child to a concurrent plan of either returning the child to the mother's custody or for the child to be adopted by her foster parents.

On March 31, 2022, DHR filed a petition in the juvenile court in which it sought to terminate the parental rights of the mother and the father. The juvenile court conducted a final hearing in the termination-of-parental-rights action on January 6, 2023, at which it received ore tenus evidence. The mother attended the final hearing from Guatemala via teleconferencing using a social-media application. The father, who was incarcerated at the time, did not attend the final hearing.

On February 10, 2023, the juvenile court entered in the termination-of-parental-rights action a judgment in which it terminated the parental rights of the mother and of the father and awarded permanent custody of the child to DHR. The mother filed a timely notice of appeal from the February 10, 2023, judgment to this court.

Before the mother's appeal was submitted to this court, DHR sought permission in this court to file in the juvenile court a motion seeking relief pursuant to Rule 60(b), Ala. R. Civ. P., from the February

10, 2023, judgment. See Rule 60(b), Ala. R. Civ. P. ("Leave to make the motion need not be obtained from any appellate court except during such time as an appeal from the judgment is actually pending before such court."); S.J. v. Henry Cnty. Dep't of Hum. Res., 367 So. 3d 1111, 1113 (Ala. Civ. App. 2022) ("[T]he mother and the father were each required to obtain leave of this court in order to file a Rule 60(b)[, Ala. R. Civ. P.,] motion challenging the judgment that was before this court for appellate review."). This court granted DHR's motion and reinvested the juvenile court with jurisdiction to enter a ruling on the Rule 60(b) motion.

In its Rule 60(b) motion, DHR alleged that the juvenile court's judgment was void for want of due process because it had not provided the mother a translator in her native language. Thus, DHR's motion sought relief under Rule 60(b)(4). See Ex parte R.S.C., 853 So. 2d 228, 235-36 (Ala. Civ. App. 2002) ("A judgment is void under Rule 60(b)(4)[, Ala. R. Civ. P.,] only if the court that rendered the judgment lacked subject-matter jurisdiction, personal jurisdiction, or if it acted in a manner inconsistent with due process of law."). On October 10, 2023, the juvenile court entered a detailed judgment denying the Rule 60(b) motion. No appeal was taken from the October 10, 2023, judgment.

The record sets forth the following facts and legal arguments. The mother is a native of and continues to live in Guatemala, and her first and primary language is Mam. During the time that the child has been in foster care, the mother has communicated with the juvenile court during hearings and in visits with the child using a videoconferencing application and the assistance of two Spanish-language interpreters. The mother appeared at the final hearing from Guatemala using a videoconferencing application available through social media. At the beginning of the final hearing, the mother had difficulty accessing the social-media application that the juvenile court had ordered to be used during that hearing. While the Spanish-language translators assisted the mother in using that application, the mother's attorney raised several arguments before the juvenile court, including that Spanish was not the mother's primary language and that fairness required that the mother be provided an interpreter who spoke her primary language. The juvenile court stated that it had been unable to locate an interpreter who spoke Mam.

In his arguments before the juvenile court, the mother's attorney briefly asserted that he was unable to render the mother effective

assistance of counsel. The mother's attorney first explained that he was "new to the case" and had only attended one previous hearing, which had been a permanency hearing. The case-action-summary sheet provided by the State Judicial Information System indicates that the mother's attorney was appointed to represent the mother in the termination-of-parental-rights action on August 31, 2022. The mother's attorney also represented to the juvenile court that, when he had spoken with the mother, Cici Melius, a Court Appointed Special Advocate ("CASA") worker, and Joanne Camp, the mother's former attorney, had interpreted the conversation for the mother in Spanish and English. The mother's attorney contended that the mother could not effectively communicate in Spanish, which, he said, he knew "from speaking to the mom on the one occasion that I talked to her and we had somebody trying to translate Spanish to her." In support of his contention that the mother did not speak Spanish well, the mother's attorney also stated that the mother had been unaware of the date of the hearing because, he said, she could not understand the Spanish-language notice with which she was served.[2]

---

[2]The record contains no information regarding whether the mother could read Spanish.

6

In response to a question from the juvenile court regarding whether he was able to communicate with the mother, the mother's attorney responded, "Can I communicate with [the mother] on a first-grade level like I am talking to a client who is in first grade, or can I communicate with her like she's a [25]-year-old mother who is about to have her [parental] rights terminated? No, I cannot." DHR's attorney maintained that the mother has only a second- or third-grade education, which might impact her understanding of the proceedings; later evidence presented by DHR indicates that the mother had an education level consistent with that of a second-grade student. During the initial arguments in the final hearing, the mother's attorney also argued that he was unable to effectively represent the mother because, he said, he could not ask her questions while witnesses were testifying. When asked whether he had any supporting authority on the issues he was arguing, the mother's attorney answered, "[n]o, sir, I do not."

"The unsworn statements, factual assertions, and arguments of counsel are not evidence." Ex parte Russell, 911 So. 2d 719, 725 (Ala. Civ. App. 2005). Therefore, given the arguments and factual assertions of the parties' attorneys regarding whether the mother spoke Spanish

7

sufficiently well to understand and communicate effectively with the court and with her attorney, the juvenile court commenced the final hearing by receiving evidence on the issue of the mother's ability to communicate in Spanish. Isis Fulgham, a state-certified interpreter of the Spanish language, informed the juvenile court that she does not speak Mam, the mother's primary language. Fulgham served as the mother's interpreter during the final hearing. The juvenile court questioned the mother regarding whether she understood the juvenile court's and the attorneys' questions concerning her ability to understand and communicate. In response, the mother stated that she speaks "a little" Spanish. However, she stated that she had not had problems communicating with the Spanish-language interpreters in this case and that she was satisfied that she could continue to do so. The juvenile court then questioned the mother about the basic facts of the case, such as the identities and respective locations of the father and the child.

The juvenile court also received testimony from Claudia Medrano, another Spanish-language interpreter who had worked with the mother. Medrano stated that she had interpreted for the mother approximately 60 to 70 times, including interpreting so that the child could

8

communicate with the mother during videoconferencing visitation; evidence was later presented indicating that the child can no longer communicate in Mam and that the mother and child needed an interpreter to communicate. Medrano stated that she had been able to adequately communicate in Spanish with the mother, had not had difficulty enabling the mother to understand concepts, and that the mother's ability to communicate in Spanish at the time of the hearing was consistent with her ability to communicate at the time Medrano was first assigned to this matter approximately one-and-a-half years before the final hearing. According to Medrano, the mother asked for clarifications only because of her education level. Medrano explained that if she is interpreting and a person uses "big words, like college words," the mother often does not understand, and Medrano must provide a definition of the word for the mother. When asked by DHR's attorney whether "the difficulty [in communicating with the mother] is [attributable] more [to] an education level, not language," Medrano answered in the affirmative.

Based on the foregoing evidence, the juvenile court overruled the objections raised by the mother's attorney, explaining:

9

"It appears to me that [the mother] is able to adequately communicate. The mother has been involved in prior hearings in this case, and this case has been going on for a while with her participating both in court and out of court. And even in the process of trying to set up the virtual [videoconferencing-application] links this morning, it appears that she has been able to understand, and we were actually able to walk her through logging in to Zoom [(a videoconferencing application)], which apparently was new for her. And although we were not able to use that means because of other technical difficulties, it appeared that we were able to adequately communicate. So, we will proceed forward."

After that decision, the mother's attorney asked permission, which was granted, to explain to the mother that if she did not understand something at any point during the hearing, she could ask questions. The juvenile court also instructed the mother that "[i]f at any time you need to speak to [the mother's attorney] privately, if you will, let us know that as well." Those instructions, as well as the remainder of the testimony, arguments, and comments during the hearing, were interpreted for the mother by Fulgham.

During the final hearing, the mother provided testimony and answered questions from her attorney, DHR's attorney, the child's guardian ad litem and the juvenile-court judge regarding the merits of DHR's termination-of-parental-rights petition. Later, during the hearing on DHR's Rule 60(b) motion, Fulgham testified that she believed that the

10

mother had understood and communicated effectively in Spanish during the final hearing. Fulgham further stated there had been no point during the final hearing in which she thought that the mother had not comprehended what was being asked or said during that hearing.

With regard to the merits of DHR's petition seeking to terminate the mother's parental rights, the record reveals the following facts.[3] The mother and the father are married and have three children. The child, who was nine years old at the time of the final hearing, is the parents' oldest child. The two younger children, who were seven and three years old, respectively, live in Guatemala with the mother. The mother testified that in 2018, the father and the child traveled through "the desert" to reach the United States. The initial immigration status of the father and the child was not clear, but at the time of the final hearing, the father was incarcerated by the Immigration and Customs Enforcement agency, and he faced deportation to Guatemala. The record indicates that, at the

---

[3]The father has not appealed the judgment terminating his parental rights. Accordingly, we set forth evidence pertaining to the father only as it might impact the resolution of the issues raised in the mother's appeal.

time of the final hearing, the child was an undocumented foreign national.

Three officers from the Opelika Police Department testified regarding incidents in which the father was arrested. That evidence indicates that the father was arrested for driving under the influence on September 14, 2019; that incident resulted in the child being placed in DHR's custody. The father was also arrested for driving under the influence on February 18, 2021. On November 22, 2022, the father was arrested on an outstanding failure-to-appear warrant after a routine traffic stop. The record does not indicate whether those arrests formed the basis for DHR's decision in August 2022 to change its permanency plan for the child from a return to the father's custody to a return to the custody of the mother.

Samantha Colyer, the DHR social worker assigned to the child's case in August 2020, testified that after a review hearing conducted on September 2, 2020, DHR began attempting to identify means by which the child could be returned to the mother's custody in Guatemala. It is undisputed that the mother was not capable of traveling to Alabama from Guatemala to retrieve the child; Colyer cited both financial reasons and

the mother's lack of a visa as reasons the mother could not travel to Alabama. Therefore, DHR asked that the mother submit to a home study. Also at that time, DHR arranged videoconferencing visits between the mother and the child to occur every two weeks. As has been already mentioned, Medrano served as an interpreter for the mother and the child during those videoconferencing visits.

Three attempts were made to obtain a home study on the mother's home. Colyer testified that a CASA worker arranged the first home study, which was to be conducted by a Guatemalan social-services agency and was scheduled to occur in December 2020. The mother did not appear for that initial home study. Latasha Durr, a CASA worker, testified that her agency arranged another home study in 2021 through the Guatemalan embassy in Atlanta, Georgia; she stated that embassy personnel had been instrumental in attempting to have the home study performed. The home-study report from the child-services agency in Guatemala revealed that the Guatemalan social workers discovered that the mother did not live in the house she sought to have evaluated; instead, that home belonged to other people who were not related to the mother. In her testimony, the mother admitted that she had sought to

13

have a house that was not hers evaluated. Medrano testified that, after that second home study, she verified that the mother had the telephone number of the Guatemalan embassy so that the mother could arrange for a home study to be conducted on the home in which the mother was actually living.[4]

In response to a question whether a third attempt had been made to conduct a home study, Durr testified that in 2022, the Guatemalan social-services agency had interviewed the mother in its offices but that no attempt at traveling to and evaluating the mother's home was made. Durr stated that she did not know why the third attempt at visiting the mother's home had not been completed. At the time of the final hearing, there was no home study that approved the placement of the child in the mother's home. Britt-nae Dowdell, another DHR social worker, stated that DHR could not approve placing the child in the mother's custody in the absence of an approved home study.

---

[4]We note that Durr also provided testimony that she had worked on a case in the past in which a child in DHR's custody had been returned to Guatemala. She explained that, in that case, the Guatemalan social-services agency had approved the home study for the mother of that child and that the Guatemalan embassy had provided an escort to accompany that child in his or her travels from the United States to Guatemala.

At the time of the final hearing, the mother testified that she was living with her two younger children in the paternal grandparents' home. However, Medrano testified that during a teleconferencing visit with the child that occurred approximately one month before the final hearing, the mother had showed the child images of a home that, the mother said, she was constructing for the family. Medrano stated that, during the videoconferencing visit that occurred in the week before the final hearing, the mother stated that she had been living in that still uncompleted home. In describing that home, Medrano stated: "it wasn't a house. It was basically, like, a box made out of blocks with no windows, you know, no doors and basically just a little bit -- some dishes and a curtain and a radio, you know, a few things." Medrano also said that there were no beds in the home. From statements made by the attorneys during arguments before the juvenile court and during the questioning of witnesses, it appears that the mother's home had dirt floors.

Medrano testified that the alternating weekly videoconferencing visits between the mother and the child, in which she served as an interpreter, were brief and typically lasted only 10 to 15 minutes. She said that during her conversations with the child, the mother often

repeated the same questions. According to Medrano, the child was often not interested in the conversations with the mother and would terminate the videoconference call. Medrano testified that although the child could sometimes see her younger siblings in the background during the videoconference calls with the mother, she and her siblings never spoke to each other. Medrano also stated that the mother would sometimes ask the child inappropriate questions and that she would have to redirect the conversation to appropriate topics. Dowdell, a DHR social worker, also testified about that nature and brevity of the mother's videoconference visits with the child; she said that the child would often respond to the mother by saying only "yes" or "no."

The mother testified that when the father traveled with the child to the United States, the father had planned to purchase land in the United States. She said that she did not know whether the family's plan had been for the entire family to relocate to the United States or to resume living together in Guatemala. However, she said, at the time of the final hearing, she wanted the child return to Guatemala to live with her. When asked how she planned to have the child return to her home in Guatemala, the mother responded that she did not know. She then

16

stated that she needed assistance from the juvenile court in paying for the child to return to Guatemala and to purchase clothes and other supplies for the child. The mother stated that, upon the child's return, she would "get a new house" in which the family could live. The mother also said that, if the child returned to Guatemala, she intended to ask the father to purchase clothes, a television, and other items that the child might need.

At the time of the final hearing, the mother said that she and the two younger children were living in the paternal grandparents' three-bedroom home with seven other family members. She stated that that home has access to clean water. The mother denied that the father had sent her money or financial support from the United States. However, Dowdell testified that the mother had reported to her that the father had sent money to her on a monthly basis while he has been in the United States. The mother said that she supports herself and the parents' two younger children through her jobs; she cuts coffee beans and works as a household cleaner. The mother also stated that the father's father ("the paternal grandfather") gave her money toward her support. On cross-examination on the issue of how she financially supports herself and her

17

children, the mother conceded that the paternal grandfather had died in June 2022, more than six months before the final hearing.

The child has been in the same foster home since she was placed in foster care in August 2019. Durr acknowledged that previous CASA workers had recommended that the child be returned to the custody of either the father or the mother. However, at the final hearing, Durr recommended that the parents' parental rights be terminated so that the child could be adopted by her foster parents. As bases for her recommendation, Durr cited the length of time that the child had been in foster care, the fact that no favorable home study had been completed in the two-and-a-half years that DHR had attempted to reunite the mother and the child, and the fact that the mother had lied about where she lived during the 2021 attempt at obtaining a home study. According to Durr, the child also repeatedly expressed that she wants to stay in the foster parents' home, where, according to Durr, she is happy and thriving. Dowdell testified that the child wanted to stay in the United States, that the child was happy with the foster parents, and that she wanted to be adopted by the foster parents.

The mother acknowledged that the child no longer speaks Mam and that the two must communicate through an interpreter. She also admitted that the child does not want to return to Guatemala. However, the mother said, the child is her only daughter, and she loves and misses the child.

After the first day of testimony, the juvenile court conducted another brief hearing at which it received ore tenus evidence on the issue of the impact on the child's immigration status with regard to various rulings the juvenile court might make on DHR's termination-of-parental-rights petition. Rebecca Salmon, the executive director of the Access to Law Foundation, testified that in order to begin the process for the child to obtain legal status within the United States, the juvenile a court must enter an order awarding permanent custody of the child to DHR or to another custodian. Salmon explained that the length of the process for a child to obtain legal status and/or citizenship in the United States is impacted by the foreign national's home country. In this case, she said, within approximately six months to one year after a permanent custody award, the child could obtain documentation allowing the child to apply for residency within the United States and for a social security number.

The residency requirement for Guatemalan foreign nationals was approximately five years at the time of the final hearing. Salmon explained that, if the child had that residency status after five years and had been adopted by the foster parents before she reached the age of 16, the child would automatically become a United States citizen. However, if the child were not adopted and remained in the permanent custody of DHR or the foster parents, the child would remain under that initial residency status and would have to apply for lawful residency status, often referred to as a "green card," on her own after she reached the age of majority.

Salmon also testified regarding the medical benefits to which the child might be entitled in the United States. Salmon explained that, even under the pendente lite custody order, DHR could have sought Medicaid coverage for the child that would cover catastrophic injuries or conditions. However, she explained, within approximately eight months or one year of a permanent custody order, the child could obtain full benefits under Medicaid. Neither party discussed whether any health-insurance coverage might be provided through the foster parents if the

parents' parental rights were terminated and the foster parents adopted the child.

The child's foster mother testified that the child is thriving in the foster parents' home, where the child had resided since June 2019. The foster mother stated that she and her family love the child, that the child loves them, and that she considers the child to be a part of the family. The foster parents want to adopt the child. The foster mother testified that the foster parents would be willing to continue having the child in their home in foster care if the juvenile court did not terminate the parents' parental rights, but she expressed concern that leaving the child in foster care might impact the child's path to obtain citizenship in the United States. She also said that, even if the juvenile court terminated the parents' parental rights, she would allow the child to maintain contact with the mother if the child wanted to do so.

<u>Due-Process Issues</u>

On appeal, the mother first argues that the juvenile court's judgment terminating her parental rights was fundamentally unfair because, she says, she received ineffective assistance of counsel. In the first part of her argument that she received ineffective assistance of

counsel, the mother contends that DHR failed to properly notify the Guatemalan Consulate General pursuant to the requirements of the Vienna Convention on Consular Relations and Optional Protocol on Disputes ("the Convention"), opened for signature Apr. 24, 1963, 21 U.S.T. 77 (entered into force with respect to the U.S. Dec. 24, 1969). Article 37 of the Convention addresses information state authorities must provide to a foreign national's embassy "in cases of deaths, guardianship or trusteeship, wrecks and air accidents." See also In re Adoption of Peggy, 436 Mass. 690, 700, 767 N.E.2d 29, 38 n.12 (2002) (Noting that the Convention imposes a duty to notify the "appropriate consular post of any case involving appointment of guardian for minor who is 'a national of the sending State.'") (quoting Article 37 of the Convention).

The mother raises her argument that DHR failed to comply with Article 37 of the Convention for the first time on appeal. Recently, this court reversed A.B. v. A.A., 334 So. 3d 223 (Ala. Civ. App. 2021), in which this court had held that because a lack of due process can render a judgment void, an argument concerning due process could be raised for the first time on appeal. This court explained:

22

"We note, though, that the holding in A.B. [v. A.A., 334 So. 3d 223 (Ala. Civ. App. 2021),] is contrary to well-established precedents from this court and from our supreme court. In Yeager v. Lucy, 998 So. 2d 460, 463 (Ala. 2008), our supreme court held that an appellant's argument that 'the trial court violated Art. I, § 10 of the Constitution of Alabama 1901, which provides "[t]hat no person shall be barred from prosecuting or defending before any tribunal in this state, by himself or counsel, any civil cause to which he is a party"' was not preserved for review.  The supreme court explained:

"'"The rule is well settled that a constitutional issue must be raised at the trial level and that the trial court must be given an opportunity to rule on the issue, or some objection must be made to the failure of the court to issue a ruling, in order to properly preserve that issue for appellate review. This Court succinctly stated this rule as follows:

"'"'In order for an appellate court to review a constitutional issue, that issue must have been raised by the appellant and presented to and reviewed by the trial court. Additionally, in order to challenge the constitutionality of a statute, an appellant must identify and make specific arguments regarding what specific rights it claims have been violated.'

23

> > """<u>Alabama Power Co. v. Turner</u>, 575
> > So. 2d 551 (Ala. 1991) (citations
> > omitted)."

> "'<u>Cooley v. Knapp</u>, 607 So. 2d 146, 148 (Ala. 1992).'

"<u>Yeager</u>, 998 So. 2d at 463. Additionally, in <u>Elliott Law Group, P.A. v. Five Star Credit Union</u>, 297 So. 3d 1148, 1153 n.6 (Ala. 2019) (Per Mitchell, J., with Sellers and Stewart, JJ., concurring), it was held that, because the appellants failed to raise the issue of due process with the trial court, that issue was waived.

> "In <u>C.F. v. State Department of Human Resources</u>, 218 So. 3d 1246, 1248 (Ala. Civ. App. 2016), C.F. argued to this court that the juvenile court's denial of her motion for a continuance violated her due-process rights. This court noted, though, that the due-process argument had not been raised to the trial court. Quoting <u>Smith v. State Department of Pensions & Security</u>, 340 So. 2d 34, 37 (Ala. Civ. App. 1976), this court explained: '"It has long been the law in this state that constitutional questions not raised in the court below will not be considered for the first time on appeal."' <u>C.F.</u>, 218 So. 3d at 1248. Therefore, we did not address C.F.'s due-process argument. Multiple other opinions from this court similarly hold that issues of due process must be preserved for appellate review. See, e.g., <u>Docen v. Docen</u>, 294 So. 3d 767, 770 (Ala. Civ. App. 2019); <u>Smith v. Smith</u>, 196 So. 3d 1191, 1198 (Ala. Civ. App. 2015); <u>A.F. v. Madison Cnty. Dep't of Hum. Res.</u>, 58 So. 3d 205, 213 (Ala. Civ. App. 2010); and <u>Wu v. Wu</u>, 37 So. 3d 792, 796-97 (Ala. Civ. App. 2009).

> "We also note that our supreme court has recently recognized that a party may attack, as void, a judgment that was entered in a manner that is inconsistent with due process by filing with the trial court a motion pursuant to Rule 60(b)(4), Ala. R. Civ. P. See <u>Crowder v. Blevins</u>, [Ms. SC-2023-0445, Mar. 22, 2024] ___ So. 3d ___, ___ (Ala. 2024). Therefore,

24

a party has a procedural vehicle through which to challenge, in the first instance, a denial of due process in the trial court.

"We conclude that the precedents requiring preservation of issues of due process are well-established and well-reasoned, and the inconsistent reasoning set forth in A.B. was incorrect. Therefore, to the extent that A.B. holds that an appellant is not required to preserve a due-process argument for appellate review, A.B. is hereby expressly overruled. We unequivocally hold, in accordance with the other well-established precedents, that issues of due process must be first presented to a trial court to be preserved for appellate review."

J.M.L. v. Tuscaloosa Cnty. Dep't of Hum. Res., [Ms. CL-2023-0765, Apr. 26, 2024] ___ So. 3d ___, ____ (Ala. Civ. App. 2024).

The mother did not argue before the juvenile court that DHR's purported failure to comply with the Convention was error or that it violated her due-process rights. She may not raise that argument for the first time on appeal. J.M.L. v. Tuscaloosa Cnty. Dep't of Hum. Res., supra. Accordingly, we do not address that argument.

The mother next contends that the juvenile court's judgment should be reversed because, she says, she did not receive effective assistance of counsel in the juvenile court. This court has explained that a parent's right to his or her child is fundamental and is protected by the due-process protections set forth in the Fourteenth Amendment to the United

25

States Constitution. <u>Crews v. Houston Cnty. Dep't of Pensions & Sec.</u>, 358 So. 2d 451, 454-55 (Ala. Civ. App. 1978).

> "'Our Supreme Court has noted that in termination-of-parental-rights cases, "a parent has a right to appointed counsel."' <u>D.A. v. Calhoun County Dep't of Human Res.</u>, 976 So. 2d 502, 505 (Ala. Civ. App. 2007) (quoting <u>Ex parte E.D.</u>, 777 So. 2d 113, 115 (Ala. 2000)). 'Inherent in that right to legal representation is the right to <u>effective</u> assistance of counsel.' <u>D.A. v. Calhoun Count[y] Dep't of Human Res.</u>, 976 So. 2d at 505."

<u>A.S.H. v. State Dep't of Hum. Res.</u>, 991 So. 2d 755, 757 (Ala. Civ. App. 2008).

The mother argues that the termination-of-parental-rights action was fundamentally unfair because, she says, a language barrier prevented her from communicating adequately with her attorney in the juvenile court. As mentioned earlier, the attorney who represented the mother was appointed in late August 2022. There is no argument that the mother's previous attorney had been unable to effectively communicate with the mother during the underlying dependency action or in the first five months that the termination-of-parental-rights action was pending. Regardless, as a part of her argument on this issue, the mother points out that the juvenile court was required to appoint an

interpreter to assist her in communicating with the court and her attorney.

> "(a)(1) If at any stage of a criminal proceeding, protection from abuse proceeding, or juvenile court proceeding or during the juvenile court intake process conducted pursuant to Sections 12-15-118 and 12-15-120[, Ala. Code 1975,] and Rule 12 of the Alabama Rules of Juvenile Procedure, the defendant, juvenile, complainant, petitioner, or a witness informs the court that he or she does not speak or adequately understand the English language, the court may appoint an interpreter.
>
> "(2) The defendant, juvenile, complainant, petitioner, or witness shall inform the appropriate court of his or her need for an interpreter immediately upon receiving notice to appear in the court.
>
> "(3) If the court determines that due process considerations require an interpreter, the court shall appoint a qualified person to interpret the proceedings for the defendant, juvenile, complainant, petitioner, or witness requesting assistance. The interpreter shall also interpret the testimony or statements of the defendant, juvenile, complainant, petitioner, or witness, and, where applicable, assist in communications with counsel.
>
> "(4) If the court has reason to believe that the defendant, juvenile, complainant, petitioner, or witness requesting an interpreter is capable of speaking and understanding the English language, the court may require that the requestor provide reasonable proof to the court of his or her inability to speak or understand the English language."

§ 15-1-3(a), Ala. Code 1975.[5]

The juvenile court appointed two Spanish-language interpreters for the mother to assist her during court proceedings and in her contacts with the child. In addition, one of the CASA workers also spoke Spanish and appears to have been the interpreter for the mother and her attorney when they spoke during the week before the final hearing. The mother contends on appeal that she did not comprehend or speak Spanish sufficiently well that she could effectively communicate with her attorney, even with the assistance of the Spanish-language interpreters. The mother argues that in order to comply with § 15-1-3(a), the juvenile court was required to locate and obtain for her an interpreter who spoke Mam, her primary language, and that its failure to do so rendered the assistance provided by her attorney ineffective.

> "The United States Court of Appeals for the Eleventh Circuit has held:

---

[5]Section 15-1-3, Ala. Code 1975, is a part of a title governing criminal procedure. However, § 15-1-3 states that it applies to a "juvenile court proceeding." In V.G.J. v. Tuscaloosa County Department of Human Resources, 368 So. 3d 886, 889 (Ala. Civ. App. 2022), this court applied § 15-1-3 in the context of a termination-of-parental-rights appeal. Neither party has argued that § 15-1-3 does not govern the appointment of an interpreter in this matter, and, therefore, we do not address that issue.

"'As a constitutional matter, the appointment of an interpreter is within the trial court's discretion. Valladares v. United States, 871 F.2d 1564, 1566 (11th Cir. 1989); see also Perovich v. United States, 205 U.S. 86, 91, 27 S. Ct. 456, 51 L. Ed. 722 (1907) .... The basic inquiry is whether the failure to provide an interpreter made the trial fundamentally unfair. [United States v.] Edouard, 485 F.3d [1324,] 1337 [(11th Cir. 2007)]; Valladares, 871 F.2d at 1566.'

"Jimenez v. Secretary, Florida Dep't of Corr., 450 F. App'x 826, 828 (11th Cir. 2012); see also United States v. Tapia, 631 F.2d 1207, 1210 (5th Cir. 1980) ('If the Court below determines, after a hearing, that [the] defendant ... was inhibited from such comprehension of the proceedings or the testimony given against him in English to such an extent as to have made the trial fundamentally unfair, [it] should grant him a new trial.'). Consistent with that standard, this court has recognized that, when determining whether an indigent party has received effective assistance of appointed counsel in juvenile-court proceedings, 'the test ... is whether an examination of the entire record demonstrates that the complaining party was afforded a fair trial.' Crews v. Houston Cnty. Dep't of Pensions & Sec., 358 So. 2d at [451,] 455 [(Ala. Civ. App. 1978).]"

V.G.J. v. Tuscaloosa Cnty. Dep't of Hum. Res., 368 So. 3d 886, 891 (Ala. Civ. App. 2022). This court has further explained with regard to the "fair trial" such as that referenced in V.G.J., supra, that

"procedural due process contemplates the basic requirements of a fair proceeding including an impartial hearing before a legally constituted court; an opportunity to present evidence and arguments; information regarding the claims of the opposing party; a reasonable opportunity to controvert the

29

opposition's claims; and representation by counsel if it is desired."

Crews v. Houston Cnty. Dep't of Pensions & Sec., 358 So. 2d at 455.

The record demonstrates that although the juvenile court attempted to obtain an interpreter who spoke Mam, it was unable to locate any interpreter who spoke that language. However, the record also indicates that the mother spoke at least some Spanish, and, therefore, the juvenile court appointed the Spanish-language interpreters for the mother. In addition, one of the CASA workers also spoke Spanish and interpreted for the mother when she spoke with her attorney before the final hearing. The juvenile court also received ore tenus evidence on the issue of the mother's ability to communicate in Spanish.

In its February 10, 2023, final judgment, the juvenile court found, in pertinent part, that "it was clear that the interpreter was able to communicate effectively with the mother." In its October 10, 2023, judgment denying DHR's Rule 60(b) motion, the juvenile court specifically determined:[6]

---

[6]Although no appeal was taken from the October 10, 2023, judgment denying DHR's motion made pursuant to Rule 60(b), Ala. R. Civ. P., that judgment is included in a supplement to the record on appeal in this matter.

"The court observed the mother's interaction with the court through the interpreter and was -- and is -- convinced that the mother was able to adequately communicate with English-speaking persons through a Spanish-language interpreter. Furthermore, the Spanish-language interpreter did not indicate any problem communicating with the mother. It is this court's finding that the mother was able to communicate as well as any person of her ability and circumstances would be. (The circumstances were difficult, as the mother participated virtually on her telephone, and she chose to do other things while the hearing was going on …. Furthermore, this court has looked to a Mam-to-English interpreter in the past and has been unable to find one.

"It appears that this is a very different situation than the one is V.G.J. v. Tuscaloosa County Department of Human Resources, 368 So. 3d 886 (Ala. Civ. App. 2022), as in this case, the mother showed that she was able to communicate through a Spanish-language interpreter. The mother had a Spanish interpreter both at trial and in preparation for trial. Although the mother did intimate that she spoke 'a little Spanish,' the evidence made it clear, and the court found, that the mother in this case is fluent in spoken Spanish. Having another termination-of-parental-rights trial with a different interpreter would do nothing other than delay permanency for the child without any valid reason for doing so."

Thus, the juvenile court concluded, in essence, that the performance of the mother's attorney had not been ineffective because of the purported language barrier. The juvenile court determined that, although it could not locate an interpreter in the mother's native language, the mother was sufficiently fluent in Spanish to effectively communicate with the court and her attorney.

31

The juvenile court relied on ore tenus evidence and its own observation of the mother and other witnesses in determining that the mother was sufficiently fluent in Spanish that the use of Spanish-language interpreters during the pendency of the termination-of-parental-rights action and during the final hearing did not render the proceedings so fundamentally unfair as to constitute a deprivation of her due-process rights. Such a determination is within the discretion of the juvenile court. See, generally, V.G.J., supra; see also United States v. Da Silva, 725 F.2d 828, 831 (2d Cir. 1983) (holding that when a criminal defendant's native language was Portuguese but the evidence established that he also spoke Spanish and was provided a Spanish-language interpreter, the trial court's finding that the defendant "was able to communicate effectively in Spanish" could be "disregard[ed] only on a showing of clear error"); Linton v. State, 275 S.W.3d 493, 500 (Tex. Crim. App. 2009) ("Therefore, the trial judge -- having the defendant in his presence, observing his level of comprehension, and asking him questions, has wide discretion in determining the adequacy of interpretive services.").

Moreover, nothing in the language of § 15-1-3 requires that an interpreter who speaks the person's primary language be provided. In the context of providing an interpreter in a criminal action, the Texas Court of Appeals has recently explained:

"If a defendant cannot understand the proceedings, fundamental fairness and due process require that the court provide an interpreter. See Linton[ v. State], 275 S.W.3d [493,] 500 [(Tex. Crim. App. 2009)]. Whether an accused receives adequate interpretation is a matter within the trial court's discretion because it depends on 'a potpourri of factors.' Id. 'The question on appeal is not whether the "best" means of interpretive services were employed, but whether the services ... were constitutionally adequate such that the defendant could understand and participate in the proceedings.' Id."

Tolentino v. State, [No. 01-22-00442-CR, Apr. 23, 2024] ___ S.W.3d ___, ___ (Tex. App. 2024).

The record supports the juvenile court's findings that the mother communicated sufficiently well in Spanish through her interpreters that the juvenile court's inability to locate an interpreter fluent in her primary language did not impair her ability to communicate with her attorney. Moreover, the evidence also demonstrates that the mother understood the termination-of-parental-rights proceedings. During the final hearing, the mother was told that she could ask questions during the hearing if

33

she did not understand something that was said. In addition, during the final hearing, the juvenile court informed the mother that she could ask her attorney questions or speak with him at any point.[7] The record does not indicate that the mother or her attorney ever asked for a pause in the final hearing to consult each other. We cannot say that the mother has demonstrated that, because of the interpreter services she received in the juvenile court, she received ineffective assistance of counsel such that the proceedings below were a violation of her due-process rights or were fundamentally unfair. See State v. Lopez-Ramos, 913 N.W.2d 695, 709 (Minn. Ct. App. 2018) (rejecting a defendant's argument that the appointment of a Spanish-language interpreter was insufficient because, "while [the defendant's] first language is Mam, the video recording and trial transcript show that he had a sufficient mastery of Spanish to effectively communicate" using a Spanish-language interpreter).

Termination-of-Parental-Rights Issues

---

[7]The mother's attorney did not request or arrange for a method by which he could communicate separately and in real time with the mother during the final hearing; such separate communication may be achieved through the videoconferencing application initially recommended by the juvenile court and similar to the one the mother elected to utilize during the final hearing.

The mother also argues that the evidence does not support the juvenile court's judgment terminating her parental rights. In an action involving a claim seeking the termination of parental rights, a juvenile court must apply a two-pronged test to determine whether to terminate a parent's parental rights. Ex parte T.V., 971 So. 2d 1, 4 (Ala. 2007) (citing Ex parte Beasley, 564 So. 3d 950, 945-55 (Ala. 1990)). This court has often stated that that that two-pronged test requires that a juvenile court determine whether a child is "dependent" and whether there are viable alternatives to termination. See, e.g., B.M. v. State, 895 So. 2d 319, 331 (Ala. Civ. App. 2004). However, in the context of a termination-of-parental-rights action, the use of the term "dependent" does not refer to that term as defined under the Alabama Juvenile Justice Act, § 12-15-101 et seq., Ala. Code 1975, in § 12-15-102(8), Ala. Code 1975. Instead, "[i]n order for the juvenile court to make a finding that a child is dependent in a case involving termination of parental rights, the juvenile court must first determine by clear and convincing evidence that grounds [under § 12-15-319(a), Ala. Code 1975,] for termination of parental rights exist." Talladega Cnty. Dep't of Hum. Res. v. J.J., 187 So. 3d 705, 711 (Ala. Civ. App. 2015). See also Ex parte T.V., 971 So. 2d at 4 ("For a

finding of dependency, the court must consider whether there are grounds for terminating the parental rights, including but not limited to the grounds specified in [former] § 26-18-7[, Ala. Code 1975, now § 12-15-319, Ala. Code 1975].").

> "'Once the court has complied with this two-prong test -- that is, once it has determined that the petitioner has met the statutory burden of proof and that, having considered and rejected other alternatives, a termination of parental rights is in the best interest of the child -- it can order the termination of parental rights.'"

Ex parte T.V., 971 So. 2d at 5 (quoting Ex parte Beasley, 564 So. 2d at 945-55). A judgment that orders the termination of a parent's parental rights must be supported by "clear and convincing" evidence, which is:

> "'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.'"

L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002) (quoting § 6-11-20(b)(4), Ala. Code 1975).

The mother argues that the juvenile court erred in determining that the evidence supported a finding that there were grounds under § 12-15-

319(a), Ala. Code 1975, for the termination of her parental rights. Section

12-15-319(a) provides, in part:

> "(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In a hearing on a petition for termination of parental rights, the court shall consider the best interests of the child. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following: …."

The mother points out that, in its termination-of-parental-rights petition, DHR made allegations pertaining only to certain portions of § 12-15-319(a), and that the juvenile court did not refer to any of those provisions in reaching its February 10, 2023, judgment. Specifically, DHR alleged that the parents had failed to provide any financial support for the child, see § 12-15-319(a)(9); that they had failed to maintain regular visits with the child, see § 12-15-319(a)(10); that they had failed to maintain consistent contact or communication with the child, see § 12-15-319(a)(11); and that they had failed to adjust their circumstances to meet the needs of the child, see § 12-15-319(a)(12). The mother contends

that the evidence does not support the termination of the mother's rights under any of the bases cited by DHR in its petition, and, therefore, she argues that the juvenile court's judgment is not supported by the evidence in the record on appeal.

The mother is correct that, in its February 10, 2023, judgment, the juvenile court did not make any specific finding citing any of the grounds listed in § 12-15-319(a). Instead, the juvenile court stated in that judgment that "[t]he court finds that termination of parental rights is substantiated in this case on multiple grounds and by clear and convincing evidence, material and substantive in nature." The juvenile court made many detailed findings concerning the facts of the case. Although the juvenile court did not connect any of those specific factual findings to the grounds set forth under § 12-15-319(a), this court may presume that the juvenile court made those determinations necessary to support its judgment and that are supported by the evidence. Ex parte A.S., 73 So. 3d 1223, 1228 (Ala. 2011); D.M. v. Walker Cnty. Dep't of Hum. Res., 919 So. 2d 1197, 1210 (Ala. Civ. App. 2005).

Although there was some evidence that the mother missed some videoconferencing visits with the child, the evidence supports a

conclusion that the mother's contact with the child was somewhat consistent. Thus, we agree with the mother that the evidence would not support the termination of her parental rights on the bases that she failed to visit and that she failed to maintain consistent contact with the child. We note, however, that nothing in the juvenile court's February 10, 2023, judgment indicates that the juvenile court relied on those grounds in reaching its decision.

The mother points out that the failure to financially support a child should be considered in a termination-of-parental-rights action only when the parent is capable of providing financial support; she contends that she was unable to make any financial contribution to the child's support. See § 12-15-319(a)(9). This court has stated that poverty alone is not a sufficient basis for the termination of a parent's parental rights. D.S.R. v. Lee Cnty. Dep't of Hum. Res., 348 So. 3d 1104, 1109 (Ala. Civ. App. 2021) (citing C.B. v. State Dep't of Hum. Res., 782 So. 2d 781, 785 (Ala. Civ. App. 1998)). There is nothing in the record that indicates that the mother was asked to contribute financially for the support of the child or that the juvenile court considered that basis in reaching its judgment. Further, while poverty cannot be the sole basis for terminating parental

rights, as is discussed below, the juvenile court's judgment indicates that the juvenile court relied on other grounds in terminating the mother's parental rights.

Among other things, the juvenile court found in its February 10, 2023, judgment:

> "The child is a native of Guatemala who was brought to the United States by the father without objection by the mother. … Neither the father nor the mother have made the necessary efforts to relieve [the child] of her dependency.
>
> "The mother remains in Guatemala and has made little if any efforts to regain custody of the child. She has not seen the child in person in years and has made no efforts to support the child. There were extraordinary efforts to conduct a home study of the mother's home in Guatemala, but even that was undermined by the mother. It does not appear that she has a very strong bond with this child. Their conversations are reportedly not very involved and not very engaging. There is almost no engagement between [the child] and her siblings when electronic communications take place. The [mother and the child] do not understand each other very much, and as [the child] has gotten older, she has steered away from her native language to the extent that she now must have an interpreter to even speak with the mother.
>
> "The court further notes that the mother's demeanor throughout these court hearing -- which obviously are of the highest importance -- where in the mother did not appear very interested in what was going on or being said in the proceedings. She often seemed distracted by other things and was doing such things as riding a bus, walking around, and speaking when off camera while the proceedings were doing on. Furthermore, it came to the court's attention that the

mother was posting still shots of the proceedings on social media with comments and markups unbecoming of a court proceeding. The mother's overall demeanor and her manner of testimony indicated that she viewed this child as more of a possession to be held onto than a child to sacrifice for."

We note that this court must rely on the juvenile court's determinations with regard to the demeanor and credibility of the mother during the final hearing. See Ex parte Bryowsky, 676 So. 2d 1322, 1326 (Ala. 1996) ("The trial court is in the better position to evaluate the credibility of the witnesses ... and the trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence ….").

In its final judgment, the juvenile court also determined that DHR and the CASA workers had made "extraordinary" efforts to reunite the mother and the child when, in addition to providing an interpreter for the mother's visitations with the child, they arranged for three separate home studies for the mother. None of those attempts resulted in an approved home study, and in one, the mother attempted to mislead Guatemalan social-services personnel and the juvenile court by having the home study performed at another person's residence. The record does not indicate that the mother had a suitable home at the time of the final

41

hearing. During the week before the final hearing, the mother informed the child and Medrano that she was living in a partially constructed home. However, the mother testified that she was living with the paternal grandparents at the time of the final hearing and that she planned to relocate from that residence if the child were returned to her custody. At the time of the final hearing, DHR had been working to reunite the mother and the child for two-and-a-half years, and the mother did not have a stable residence to which the child could return. Therefore, the evidence supports a conclusion that the mother had not adjusted her circumstances to meet the child's needs. See § 12-15-319(a)(12).

Moreover, the child was unable to communicate with the mother in her native language and had not seen the mother in person for at least four years. At the time of the final hearing, there was no feasible plan in place that would allow the child to return to Guatemala. The child had been in foster care for three-and-a-half years at the time of the final hearing and had been in the same foster home for all that time. In its judgment, the juvenile court also found that the child had formed a significant and important emotional bond with her foster parents and that it would not be in the child's best interests to sever that bond. See §

42

12-15-319(a)(13); see also A.D. v. R.P., 345 So. 3d 657, 665 (Ala. Civ. App. 2021) (holding that an issue not alleged in a party's petition may be considered by the juvenile court if that issue is tried by the implied consent of the parties under Rule 15(b), Ala. R. Civ. P.); Herring v. Madison Cnty. Dep't of Hum. Res., 279 So. 3d 1151, 1162 (Ala. Civ. App. 2018). We conclude that the evidence in the record and the findings in the juvenile court's judgment support the conclusion that the mother was either unwilling or unable to discharge her responsibilities to and for the child and support the juvenile court's finding that the mother's circumstances and condition were unlikely to change in the foreseeable future. See § 12-15-319(a).

The mother last argues that the juvenile court erred in determining that there were no viable alternatives to the termination of her parental rights. See Ex parte T.V., 971 So. 2d at 5. The mother contends that maintaining the "status quo" by leaving the child in DHR's custody in foster care and allowing the mother to continue videoconference visits with the child was a viable alternative to termination.

In general, leaving a child in foster care indefinitely is not a viable alternative to termination because doing so does not provide the child

with permanency. T.W. v. Calhoun Cnty. Dep't of Hum. Res., [Ms. CL-2022-0694, June 2, 2023] ___ So. 3d ___, ___ (Ala. Civ. App. 2023); B.M. v. Jefferson Cnty. Dep't of Hum. Res., 183 So. 3d 157, 161 (Ala. Civ. App. 2015). See also K.A.P. v. D.P., 11 So. 3d 812, 820 (Ala. Civ. App. 2008) ("[T]he appellate courts generally hold that maintaining an indefinite custody arrangement with a third party is not in the best interests of the child."). An exception to that general rule exists for situations in which maintaining the status quo would allow the parent and child to maintain a beneficial relationship and where the evidence demonstrates that preserving that relationship would be in the child's best interests. S.N.W. v. M.D.F.H., 127 So. 3d 1225, 1230 (Ala. Civ. App. 2013).

With regard to whether there was a viable alternative to termination in this case, the juvenile court found that "given the overall circumstances, including [the child's] immigration and medical-care situation, being adopted by her foster parents is a far better option for her than them just being custodians." It then stated that it had considered and rejected all possible alternatives to termination as not being viable. "The determination of whether a viable alternative to termination of parental rights exists is a question of fact to be decided by

44

the juvenile court." <u>J.B. v. Cleburne Cnty. Dep't of Hum. Res.</u>, 991 So. 2d 273, 282 (Ala. Civ. App. 2008).

In the two-and-a-half years that DHR worked to reunite the mother and the child, the mother did not obtain a favorable home study, and on one occasion, she had Guatemalan social-service workers evaluate a home in which she did not reside. Neither the mother nor DHR set forth a plan pursuant to which the child might ever be reunited with the mother.

Moreover, the juvenile court determined that the bond between the mother and the child is not strong. The child has not seen the mother in approximately four years, and she no longer speaks her primary language and requires a translator to speak with the mother. The interpreter's description of the conversations between the mother and the child indicate that they are superficial and that the child often grows bored and terminates the videoconference visit with the mother. Thus, there is no evidence of a bond between the mother and the child that is so beneficial to the child that preserving the relationship and leaving the child in foster care indefinitely would be in the child's best interests.

The child has been in foster care for three-and-a-half years, and in that time, she has formed loving relationships with the members of her foster family. The child's foster parents want to adopt her and provide her permanency. The record also demonstrates that, if the child is adopted, she has a years' long, but clear, path to obtaining United States citizenship. However, if the child remains indefinitely in foster care, she will leave foster care when she reaches the age of majority with only residency status and without a green card. The juvenile court determined that, under the facts of this case, it was not in the child's best interests to be returned to Guatemala and her mother's custody. In an action involving the possible termination of a parent's parental rights, "the paramount consideration of the [juvenile] court, and of this court, is the best interests of the children involved." A.R.E. v. E.S.W., 702 So. 2d 138, 140 (Ala. Civ. App. 1997). Given the facts of this case, we cannot say that the mother has demonstrated that the juvenile court erred in determining that there were no viable alternatives to the termination of the mother's parental rights.

We affirm the juvenile court's February 10, 2023, judgment.

AFFIRMED.

Moore, P.J., and Fridy and Lewis, JJ., concur.

Edwards, J., concurs in the result, without opinion.